John R. MILDENBERGER, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 06–760 L.

United States Court of Federal Claims.

Jan. 29, 2010.

Roger J. Marzulla, Washington, DC, for plaintiffs. Nancie G. Marzulla, Washington, DC, of counsel.

Steven D. Bryant, Washington, DC, with whom was John C. Cruden, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, for defendant. Brooks W. Moore and Jennifer A. Misciagna, Assistant District Counsel, U.S. Army Corps of Engineers, Jacksonville, FL, of counsel.

Paul J. Nicoletti, Stuart, FL, with Robert L. Kilbride, Assistant City Attorney, for amicus curiae City of Stuart, Florida.

Stephen Fry, Stuart, FL, for amicus curiae Martin County, Florida.

Keith W. Rizzardi, West Palm Beach, FL, with Sheryl Wood, General Counsel, for amicus curiae South Florida Water Management District.

## OPINION AND ORDER

BUSH, Judge.

This takings case is currently before the court on defendant's motion to dismiss, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), defendant's motion for summary judgment pursuant to RCFC 56, and plaintiffs' cross motion for summary judgment, pursuant to RCFC 56. For the reasons set forth herein, plaintiffs' cross motion for summary judgment is denied, defendant's motion to dismiss is granted in part and denied in part, and defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

In this case, the court must decide whether the transfer of water from one navigable waterway into another as part of a comprehensive system of water management effects an uncompensated physical taking of the riparian rights held by owners of land situated along the receiving body of water. This appears to be an issue of first impression in this court. The United States Court of Appeals for the Federal Circuit has noted that "[t]he issue of whether a taking has occurred is a question of law based on factual underpinnings." *Air Pegasus of D. C., Inc. v. United States*, 424 F.3d 1206, 1212 (Fed.Cir. 2005). Because of the highly fact-intensive nature of the required takings analysis, the court must engage in a thorough examination of the relevant facts in this case.

## I. Factual Background[1]

### A. Plaintiffs and the St. Lucie River and Estuary

Each of the named plaintiffs in this case is an owner in fee simple of one or more parcels of riparian land and related improvements located along the St. Lucie River, the Indian River or the St. Lucie Canal (also known as the C–44 Canal) in southeastern Florida. Compl. ¶¶ 1–22; Pls.' Mot. Ex. 7 (Pls.' Declarations). The St. Lucie River is composed of two forks, the North Fork and the South Fork, which converge near the city of Stuart before flowing east and then south into the Indian River Lagoon. Expert Declaration of Mark D. Perry (Perry Decl.) ¶ 6. The Indian River Lagoon is connected to the Atlantic Ocean at the St. Lucie Inlet and is a part of the Atlantic Intracoastal Waterway. Id.; Declaration of James H. Hammond (Hammond Decl.) ¶ 9. The St. Lucie River, the St. Lucie Canal and the Indian River Lagoon are all navigable bodies of water. Hammond Decl. ¶ 3.

Until the late nineteenth century, the St. Lucie River was a freshwater stream with no permanent physical connection to the Atlantic Ocean. Id. ¶ 9; Declaration of Andrew E. Geller (Geller Decl.) ¶ 7. In 1892, a consortium of private interests constructed the St. Lucie Inlet to provide a navigable connection between the Atlantic Ocean and the Indian River Lagoon adjacent to the mouth of the St. Lucie River. Hammond Decl. ¶ 9; Geller Decl. ¶ 7; Def.'s Reply Ex. C at 130. The construction of the inlet and the resulting tidal flow of salt water into the St. Lucie River resulted in a brackish marine environment that now supports a large number of plant and animal species that cannot survive in either pure fresh water or pure sea water. Perry Decl. ¶ 4. As recently as 1998, the estuary provided habitat for more than 4000 plant and animal species, including manatees, dolphins, sea turtles and a wide variety of fish and invertebrates. Expert Declaration of Richard Grant Gilmore, Jr. (Gilmore Decl.) ¶ 6. According to plaintiffs, defendant's high-volume discharges of polluted fresh water into the South Fork of the St. Lucie River have dramatically reduced aquatic plant and animal populations and irreparably damaged the environmental health of the estuary. Compl. ¶¶ 28–31; Pls.' Mot. at 5–13; Perry Decl. ¶¶ 8–13. Under this scenario, plaintiffs argue that defendant's actions have effected a physical taking of their riparian rights in the use and enjoyment of the St. Lucie River.

### B. Lake Okeechobee and the Central and Southern Florida Project

Lake Okeechobee is located approximately twenty-five miles southwest of the St. Lucie River and is the second largest freshwater lake in the continental United States. Geller Decl. ¶ 2; Hammond Decl. Ex. G. Although several natural streams and artificial canals flow into Lake Okeechobee from the north, the lake does not possess any well-defined natural outlet for the release of excess water. Geller Decl. ¶ 24; Hammond Decl. Ex. G. Historically, such water generally spilled over the southern rim of Lake Okeechobee and flowed south and west in a large, slow-moving sheet that formed the northern portion of the Everglades. Perry Decl. ¶ 8; Expert Declaration of Paul N. Gray, Ph.D. (Gray Decl.) ¶ 10. Prior to the development of significant drainage infrastructure in south Florida, much of the land located south of Lake Okeechobee was inundated for months following the summer wet season. Gray Decl. ¶¶ 18–20. Such flooding was the principal impediment to development in south Florida during the late nineteenth and early twentieth centuries. Geller Decl. ¶ 5.

From the beginning, it was apparent that the reclamation of much of south Florida would require some means of lowering the level of Lake Okeechobee in order to prevent the natural flow of excess water over the lake's southern rim. In the late nineteenth and early twentieth centuries, both private interests and state agencies constructed a number of significant infrastructure projects in an attempt to achieve that objective. Geller Decl. ¶ 5; Def.'s Opp'n to Pls.' Mot. to Strike Hammond Decl. Ex. B (Okeechobee Waterway Report) at 3–1 to 3–12. Over a period of several decades, many of those early drainage projects were consolidated

---

1. The facts presented in this section are undisputed by the parties unless otherwise noted.

into a comprehensive federal project known as the Central and Southern Florida (C & SF) Project. The C & SF Project is an integrated water management system that covers an area of approximately 16,000 square miles and extends from just south of Orlando to the Florida Bay. Geller Decl. ¶ 2; Hammond Decl. ¶ 2. The system now includes more than 1000 miles of canals, 1000 miles of levees, 250 water control structures and seventeen pump stations. Geller Decl. ¶ 3. Lake Okeechobee, the C–44 Canal and the St. Lucie River are central components of the C & SF Project. *Id.* ¶ 2; Hammond Decl. ¶ 2.

As noted above, the C & SF Project incorporated a number of smaller flood control and drainage projects that were initially constructed by state and private actors. Federal involvement in what would later become the C & SF Project was initiated by the Rivers and Harbors Act of 1930, Pub.L. No. 71–520, 46 Stat. 918. Geller Decl. ¶ 6; Hammond Decl. ¶ 2. In that act, Congress authorized the construction of an improved levee system along the northern and southern shores of Lake Okeechobee. Geller Decl. ¶ 6. Those levees were subsequently named the Herbert Hoover Dike. In addition, the 1930 act further provided that the federal government would operate and maintain the Okeechobee Waterway system.

The Okeechobee Waterway is approximately 154 miles in length and provides a continuous navigable channel across the Florida peninsula between the Atlantic Ocean and the Gulf of Mexico. Geller Decl. ¶ 9; Hammond Decl. ¶ 3. Vessels traveling through the Okeechobee Waterway enter the waterway from the Atlantic Ocean through the St. Lucie Inlet and continue through the Indian River Lagoon, the St. Lucie River, the St. Lucie Canal, Lake Okeechobee, and the Caloosahatchee River, and enter the Gulf of Mexico near Fort Myers, Florida. Hammond Decl. ¶¶ 3, 8. The Okeechobee Waterway began operation as a federal project in 1937 and has become an important navigational corridor through the state. *Id.* ¶ 3. Approximately 10,000 vessels now pass through the St. Lucie Lock each year, carry-

ing approximately 26,000 tons of manufactured goods, equipment, machinery, and raw materials.[2] *Id.* ¶ 6.

The Okeechobee Waterway and much of the existing drainage infrastructure in south Florida were subsequently absorbed into the C & SF Project with the enactment of the Flood Control Act of 1948, Pub.L. No. 80–858, 62 Stat. 1175. Hammond Decl. ¶¶ 2–3. The principal design features of the C & SF Project were proposed in an official report prepared by the U.S. Army Corps of Engineers. *See* Comprehensive Report on Central and Southern Florida for Flood Control and Other Purposes, H.R. Doc. No. 80–643 (1948) (C & SF Report). The comprehensive plan identified and discussed a number of the C & SF Project's objectives, including flood control, water control, water conservation, prevention of saltwater intrusion, fish and wildlife preservation, and navigation. *Id.* at 33–38. Although navigation was identified as one of the many purposes to be furthered by the C & SF Project, the comprehensive plan noted that the project would "serve the purposes of flood protection, drainage, and water control to a far greater degree than navigation." *Id.* at 2. The navigational purposes of the C & SF Project were described in the report as "relatively small and incidental when compared with the primary features of flood protection and water control...." *Id.*

The Flood Control Act of 1948 authorized the construction of the first phase of the C & SF Project as described in the comprehensive plan. The remaining features of the comprehensive plan were later authorized by the Flood Control Act of 1954, Pub.L. No. 83–780, 68 Stat. 1248. The system was subsequently expanded and modified by the Flood Control Act of 1958, Pub.L. No. 85–500, 72 Stat. 297, the Flood Control Act of 1960, Pub.L. No. 86–645, 74 Stat. 480, the Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, the Flood Control Act of 1965, Pub.L. No. 89–298, 79 Stat. 1073, the Flood Control Act of 1968, Pub.L. No. 90–483, 82 Stat. 731, and other federal statutes. Geller Decl. Ex. B at FEIS–4.

---

**2.** There are five navigation locks located along the Okeechobee Waterway. Hammond Decl. ¶ 4.

Within the C & SF Project, water is constantly transferred from one location to another in order to achieve the system's various purposes. In operating the C & SF Project, defendant frequently discharges high volumes of non-saline water into the St. Lucie River. Those discharges are the subject of the instant suit.

## C. Management of Lake Levels and Water Discharges into the St. Lucie River

One of the central purposes of the C & SF Project is to protect the structural integrity of the Herbert Hoover Dike by maintaining the level of Lake Okeechobee within an acceptable range.[3] In addition to direct rainfall, high volumes of water enter the lake from the Kissimmee River and Lake Istokpoga basins to the north, as well as from the lake's own watershed. Geller Decl. ¶ 24. Water also enters the lake from the St. Lucie Canal to the east and from four major agricultural drainage canals to the south. Water levels in Lake Okeechobee are significantly affected by both rainfall and drainage from the surrounding watershed, and when inflows into the lake exceed outflow capacity, the water level within the lake can rise very quickly. Id. ¶ 14. In order to manage the level of Lake Okeechobee and prevent damage to the Herbert Hoover Dike, water is released from the lake into the Caloosahatchee River to the west and into the St. Lucie Canal to the east. Id. Most of the water discharged into the St. Lucie Canal ultimately reaches the St. Lucie River, the Indian River Lagoon, and the Atlantic Ocean. Expert Declaration of Robert L.P. Voisinet (Voisinet Decl.) ¶ 10.

The maintenance of high water levels in Lake Okeechobee for any extended period of time threatens the structural integrity of the surrounding levees. When water levels reach eighteen feet, for example, the probability that the levees will fail is approximately forty-five percent.[4] Gray Decl. ¶ 24. When the lake reaches twenty-one feet, moreover, the risk of levee failure increases to 100 percent. Id. Despite defendant's repeated and massive discharges of water into the St. Lucie River, the lake has reached an elevation in excess of seventeen feet on seven separate occasions since 1995. Id.

Defendant manages water levels in Lake Okeechobee in accordance with a regulation schedule. Geller Decl. ¶ 11; Gray Decl. ¶ 11. A regulation schedule is an official management policy that dictates the rate at which water is released from a lake or reservoir based on the current water level within that lake or reservoir. Geller Decl. ¶ 11; Gray Decl. ¶¶ 11–12. During the period of time in which the alleged taking of plaintiffs' property rights occurred, water releases from Lake Okeechobee were generally made in accordance with a regulation schedule known as Water Supply and Environment (WSE). Geller Decl. ¶ 13; Gray Decl. ¶ 11. WSE was adopted in 2000 and was designed to promote the various objectives of the C & SF Project, such as flood control, water supply, navigation, prevention of saltwater intrusion, and environmental protection.[5] Geller Decl. ¶¶ 12–13.

Under WSE, defendant released water from Lake Okeechobee at a rate determined by the lake's elevation and the time of year. Id. ¶ 11; Gray Decl. ¶¶ 11–12. Defendant releases lake water into the St. Lucie Canal through a structure known as S–308. Voisinet Decl. ¶¶ 9–10, 12. When the lake is at a relatively low stage, however, water flows into the lake from the St. Lucie Canal through the same structure. Id. ¶ 9. In addition to maintaining the level of the lake

---

3. The flood-control features authorized in the Rivers and Harbors Act of 1930 were approved in response to hurricanes in 1926 and 1928, which caused the water in Lake Okeechobee to breach the surrounding levees. The catastrophic flooding in the surrounding area following those hurricanes resulted in more than 3000 deaths. Geller Decl. ¶ 6.

4. Lake elevation measurements are presented in National Geodetic Vertical Datum 1929 (NGVD).

5. In 2007, WSE was replaced with a new regulation schedule referred to as the Lake Okeechobee Regulation Schedule 2007 ("LORS 2007"). Geller Decl. ¶ 12. The government's change from WSE to LORS 2007 has no impact on the present case and, for purposes of the current litigation, references will be made to WSE only.

within an acceptable range, defendant's releases of water through S–308 also maintain minimum navigational depths within the St. Lucie Canal and supply water to agricultural, industrial and municipal users located within the St. Lucie Canal watershed. Geller Decl. ¶¶ 20, 22; Declaration of Trent L. Ferguson (Ferguson Decl.) ¶ 6. Defendant constructed the S–308 structure in 1977. Ferguson Decl. ¶ 4.

In addition to releases required under the regulation schedule, defendant sometimes discharges water from the lake when such releases would not otherwise occur under that schedule. Declaration of John E. Zediak (Zediak Decl.) ¶¶ 3–4. Between 2003 and 2005, for example, defendant made a number of low-level releases from the lake pursuant to a "temporary planned deviation" from the regulation schedule. Id. Defendant approves such deviations when it expects future inflows into the lake to exceed its ability to maintain the lake at a safe elevation in accordance with the flow rates permitted under the regulation schedule. Id. Even at a relatively high release rate, it sometimes requires a very long period of time to achieve even modest reductions in lake levels. Id. ¶ 8. Because releases under a temporary planned deviation are typically made in anticipation of—rather than in response to—significant rainfall, releases into the St. Lucie River are not always correlated with named storm events. Id. ¶ 7; Voisinet Decl. ¶ 27.

Defendant releases water from the St. Lucie Canal into the South Fork of the St. Lucie River through the St. Lucie Lock and the adjacent St. Lucie Spillway (also referred to as structure S–80). Voisinet Decl. ¶¶ 9–10, 12. Defendant constructed the existing S–80 control structure in 1941 and is responsible for its operation and maintenance. Hammond Decl. ¶¶ 4–6. Unlike the S–308 structure, the S–80 control structure operates in only one direction (i.e., water does not enter the St. Lucie Canal from the St. Lucie River through S–80). Voisinet Decl. ¶ 9. In addition to receiving discharges of lake water through S–308, the St. Lucie Canal also collects a substantial amount of drainage from its own watershed. Id. ¶¶ 12, 17. Consequently, the water that is discharged into the St. Lucie River through the S–80 control structure includes both lake water and drainage from the St. Lucie Canal watershed.

The St. Lucie River collects fresh water from a number of different sources. Ferguson Decl. ¶ 8, Table 2; Supplemental Declaration of Trent L. Ferguson (Ferguson Suppl. Decl.) ¶ 5; Voisinet Decl. ¶¶ 17, 24–25. In addition to direct rainfall and natural runoff within its own watershed, the estuary receives fresh water containing significant amounts of nutrients and sediment from three major canals: the St. Lucie Canal (through the S–80 structure), the C–23 Canal (through the S–48 structure), and the C–24 Canal (through the S–49 structure). Ferguson Decl. ¶ 8, Table 2; Ferguson Suppl. Decl. ¶¶ 8–11, Tables 3–5, Figures 3–10; Voisinet Decl. ¶¶ 11, 14, 17, 25, 55–56, 59–67. The C–23 Canal and the C–24 Canal collect drainage from smaller canals located throughout the regional watershed to the north and northwest of the St. Lucie River. Voisinet Decl. ¶ 11.

### D. Discharges between 2003 and 2005 and the Alleged Taking of Plaintiffs' Property Rights

Plaintiffs claim that defendant's discharges of polluted fresh water from Lake Okeechobee into the St. Lucie River between 2003 and 2005 destroyed the estuary's natural environment and effected an unconstitutional taking of their riparian rights without just compensation in violation of the Takings Clause of the Fifth Amendment. Compl. ¶¶ 31–37.

Average lake levels were unusually high for long periods of time between 2003 and 2005. Geller Decl. ¶ 18; Zediak Decl. ¶ 2. As a result, annual discharges of water into the St. Lucie River through the S–80 control structure were similarly high in those years, as were discharges from Lake Okeechobee into the St. Lucie Canal through the S–308 control structure. Defendant states that the releases made during that period were necessary to protect the structural integrity of the Herbert Hoover Dike. Def.'s Mot. at 7–9.

In August and September of 2003, net inflows into the lake amounted to approximately thirty-six inches in equivalent lake

depth. Zediak Decl. ¶ 5. In 2003, defendant discharged approximately 179 billion gallons of water from Lake Okeechobee into the St. Lucie Canal through the S–308 control structure. Ferguson Decl. Table 2; Voisinet Decl. ¶ 17. In that same year, total discharges from the St. Lucie Canal into the St. Lucie River through the S–80 control structure amounted to approximately 236 billion gallons of water.[6] Ferguson Decl. Table 2; Voisinet Decl. ¶ 17. Lake Okeechobee reached a maximum elevation of 17.15 feet in 2003. Second Supplemental Declaration of Trent L. Ferguson (Ferguson 2d Suppl. Decl.) Table 2.

In late 2003, an active tropical storm season was predicted for 2004. Geller Decl. ¶ 15. Due to that forecast and high lake levels between November 2002 and December 2003, defendant approved a temporary planned deviation from the regulation schedule, which remained in effect from December 2003 through May 2005. Zediak Decl. ¶ 3. The temporary deviation allowed defendant to make low-level releases from the lake that would not have occurred under the regulation schedule. Hurricanes Frances, Ivan, and Jeanne all struck Florida between August and October of 2004, and the net inflows into Lake Okeechobee during that period exceeded seventy-two inches of equivalent lake depth. Id. ¶ 5. Following the hurricanes in October, Lake Okeechobee reached a maximum elevation of 18.02 feet. Geller Decl. ¶ 15; Ferguson 2d Suppl. Decl. Table 2. In 2004, defendant released approximately 190 billion gallons of lake water into the St. Lucie Canal through the S–308 control structure and approximately 225 billion gallons of water into the St. Lucie River through S–80. Ferguson Decl. Table 2; Voisinet Decl. ¶ 17.

In June and July of 2005, net inflows into Lake Okeechobee amounted to approximate-ly forty-seven inches of equivalent lake depth. Zediak Decl. ¶ 5. In 2005, defendant released approximately 304 billion gallons of lake water into the St. Lucie Canal through the S–308 control structure and approximately 399 billion gallons of water into the St. Lucie River through S–80. Ferguson Decl. Table 2; Voisinet Decl. ¶ 17. The lake reached a maximum elevation of 17.12 feet in 2005. Ferguson 2d Suppl. Decl. Table 2.

According to plaintiffs, defendant's releases of turbid fresh water into the South Fork of the St. Lucie River have resulted in a number of adverse environmental impacts on the estuary. First, the discharges have repeatedly resulted in dramatic and prolonged reductions in the salinity of the river. Perry Decl. ¶ 17. Because many of the plant and animal species in the estuary can survive only within a relatively narrow salinity range, plaintiffs claim that defendant's high-volume discharges of non-saline water into the river have gradually resulted in the disappearance of many acres of oyster and sea grass beds, as well as a significant reduction in other plant and animal populations. Id. ¶¶ 11–13, 17–20. Second, plaintiffs claim that the high nutrient content of the water discharged into the river has resulted in algal blooms and the proliferation of toxic cyanobacteria that present serious risks to human health and safety. Id. ¶¶ 9, 11; Gilmore Decl. ¶¶ 21–22. Finally, plaintiffs argue that defendant's discharges have carried massive amounts of sediment into the river, resulting in significant muck deposits on the bed of the river and a dramatic reduction in water clarity and depth. Expert Declaration of Kevin Henderson (Henderson Decl.) ¶ 9; Perry Decl. ¶¶ 9, 11.

In addition to the alleged damage to the river itself, certain plaintiffs further claim that defendant's discharges have resulted in a number of injuries to their upland parcels.

---

6. Defendant releases water from Lake Okeechobee into the St. Lucie Canal through the S–308 control structure. Voisinet Decl. ¶ 12. Defendant releases water from the St. Lucie Canal into the St. Lucie River through the S–80 control structure. Id. ¶ 9. The annual discharges through the S–308 control structure provide a rough approximation of the total quantity of water released from Lake Okeechobee into the St. Lucie River each year. Id. ¶¶ 17–18. The difference between the quantity of water released through S–308 and the quantity of water released through S–80 provides a rough approximation of the quantity of water that enters the St. Lucie Canal from its own watershed. Id. ¶ 17. Because water is diverted from the St. Lucie Canal to meet the needs of agricultural, municipal, and industrial users, the releases through S–308 and S–80 do not provide an exact measurement of the quantity of water entering the St. Lucie River from Lake Okeechobee and the St. Lucie Canal watershed.

First, plaintiffs Robert and Carol Baratta claim that the water in their well has become contaminated as a result of the discharges and can no longer be used to clean their house or to water plants on their property. Declaration of Robert O. Baratta (Baratta Decl.) ¶ 2. Plaintiffs William and Stella Guy allege that defendant's discharges flooded their garage and damaged all of the property located on the floor of the garage. Declaration of William E. Guy, Jr. (Guy Decl.) ¶ 2. Plaintiff Ann MacMillan asserts that defendant's discharges of polluted water into the St. Lucie River resulted in the death of mangrove trees located on her upland property. Declaration of Ann S. MacMillan (MacMillan Decl.) ¶ 2. Finally, a number of plaintiffs generally state that defendant's discharges result in unpleasant odors that waft over their upland parcels. *See* Declaration of Charles C. Crispin (Crispin Decl.) ¶ 2; Declaration of Floyd D. Jordan (Jordan Decl.) ¶ 2; Declaration of John R. Mildenberger (Mildenberger Decl.) ¶ 3; Declaration of Robert H. Paré (Paré Decl.) ¶ 2; Declaration of John Francis Patteson (Patteson Decl.) ¶ 2; Declaration of Frederick Rutzke (Rutzke Decl.) ¶ 2; Declaration of Philip Tafoya (Tafoya Decl.) ¶ 2; Declaration of Rufus Wakeman II (Wakeman Decl.) ¶ 2.

Plaintiffs request relief in the form of a monetary judgment equal to the just compensation owed to each plaintiff together with interest, in an amount estimated to be at least $50 million.

## II. Procedural History

Plaintiffs commenced suit in this court on November 13, 2006, alleging that defendant's intentional and repeated discharges of polluted non-saline water into the St. Lucie River effected a physical taking of plaintiffs' riparian rights without just compensation in violation of the Takings Clause of the Fifth Amendment. Plaintiffs have requested $50 million in compensation for the property allegedly taken, plus reasonable attorneys' fees and costs. Defendant filed its answer to the complaint on February 12, 2007, and the parties conducted discovery in 2007 and 2008.

On January 16, 2009, defendant filed a motion to dismiss plaintiffs' suit and a motion for summary judgment. In support of its motion to dismiss under RCFC 12(b)(1), defendant argues that any alleged harm to plaintiffs' upland parcels sounds in tort and is therefore beyond the jurisdiction of this court. According to defendant, any claims related to the alleged invasion of plaintiffs' upland parcels above the ordinary high water line are not appropriately treated as physical takings; on the contrary, those claims must be analyzed as torts.

Defendant makes three principal arguments in support of its motion for summary judgment under RCFC 56. First, defendant denies that its discharges were the direct and proximate cause of any of the alleged environmental damage to the St. Lucie River. According to defendant, those discharges were caused by unusually high rainfall between 2003 and 2005, and a failure to make those releases would have compromised the structural integrity of the levee system surrounding Lake Okeechobee. Second, defendant argues that plaintiffs' claims are barred by the federal navigational servitude. According to defendant, any interests plaintiffs may have in the use or enjoyment of the St. Lucie River are subordinate to the superior right of the federal government to improve and protect navigation. Finally, defendant claims that plaintiffs have failed to demonstrate the possession of a cognizable property right under state law. Because the riparian interests allegedly taken by defendant's actions are held in common with the general public, any deprivation of those rights cannot form the basis of a valid takings claim. For those reasons, defendant asserts that it is entitled to judgment as a matter of law.

On March 16, 2009, plaintiffs filed a timely opposition to defendant's motion to dismiss, as well as a cross motion for summary judgment on the issue of liability. Plaintiffs first assert that they possess a protected property right in the use of the St. Lucie River under state law that cannot be taken by the government without just compensation. In addition, plaintiffs reject defendant's contention that high precipitation was the cause of the discharges into the St. Lucie River between 2003 and 2005. In support of that argument, plaintiffs note that many of the discharges

occurred between hurricanes and in non-hurricane years. Plaintiffs further argue that the federal navigational servitude does not apply in this case because defendant's discharges of polluted water into the St. Lucie River were unrelated to any navigational purpose. According to plaintiffs, the primary purposes of the releases into the river were flood protection and agricultural irrigation. Finally, plaintiffs dispute defendant's claim that the alleged injuries to plaintiffs' upland parcels sound in tort. Plaintiffs assert that the government's discharges effected a physical taking of their riparian rights without compensation, and that they are entitled to judgment as a matter of law on that basis.

On May 20, 2009, defendant filed its response, in which it expanded upon the arguments first presented in its motions to dismiss and for summary judgment. In addition to reiterating its assertion that unusually high precipitation was the root cause of the discharges into the St. Lucie River, defendant further argues that it was not the source of the nutrients and sediment present in the discharged water. Defendant also claims that there is insufficient evidence to conclude that the water discharged through the S–80 control structure resulted in the alleged damage to the St. Lucie River because the river also receives substantial additions of nutrients and sediment from a number of other sources, such as the C–23 Canal, the C–24 Canal, and local runoff along the river. Defendant also argues that plaintiffs' claims of noxious odors and aerosols resulting from the discharges might provide the basis for a tort claim, but do not constitute a physical taking of their property. Finally, defendant once again argues that plaintiffs do not possess any compensable property rights under state law and that, in any event, any such rights would be subordinate to the federal navigational servitude.

On June 19, 2009, plaintiffs filed their reply to defendant's response. Plaintiffs first argue that defendant directly and proximately caused the environmental damage to the St. Lucie River because its discharges would not have occurred in the absence of a deliberate decision by defendant to open the gates of the S–308 and S–80 control structures. Plaintiffs further claim that they possess compensable property rights as riparian landowners in the use of the St. Lucie River for fishing, boating, swimming, and recreation, and that those rights are unaffected by the federal navigational servitude because defendant's discharges were not related to any navigational purpose. Plaintiffs also assert that riparian landowners in Florida possess a protected property right to pollution-free water in the navigable waterway adjacent to their property. Finally, plaintiffs note that the alleged injuries to their upland parcels are properly analyzed as takings rather than as torts.

On August 27, 2009, the court ordered supplemental briefing from the parties on a number of legal and factual issues. Specifically, the court requested the acquisition dates for each of plaintiffs' upland parcels and directed the parties to address whether plaintiffs' suit was time-barred under the six-year statute of limitations applicable to takings claims in this court. The court further instructed the parties to discuss whether the accrual of plaintiffs' claims was delayed pursuant to the stabilization doctrine first articulated by the United States Supreme Court in *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). Finally, the court asked the parties to discuss the applicability of the Federal Circuit's recent decision in *N.W. La. Fish & Game Pres. Comm'n v. United States*, 574 F.3d 1386 (Fed.Cir.2009) *(Louisiana Fish & Game III)*, cert. denied, —— U.S. ——, 130 S.Ct. 1072, —— L.Ed.2d —— (2010) (No. 09–516), to the facts of the present case.

Plaintiffs filed their supplemental brief on September 25, 2009. Plaintiffs' supplemental brief provided the factual information requested by the court and addressed each of the legal issues raised by the court. Plaintiffs assert that the stabilization doctrine set forth in *Dickinson* applies in this case and argue that their takings claims accrued under that doctrine no earlier than September 2004. Plaintiffs further argue that the Federal Circuit's recent decision in *Louisiana Fish & Game III* did not change the relevant

legal standards for determining the scope and applicability of the federal navigational servitude. According to plaintiffs, the servitude simply does not apply in this case because defendant's discharges are not related to the improvement of navigation. In addition, plaintiffs further claim that the case stands for the proposition that the navigational servitude never applies to cases in which a governmental action results in the flooding of private property.

Defendant filed its supplemental brief on October 16, 2009. Defendant argues that plaintiffs' suit is barred by the six-year statute of limitations because defendant has been discharging large volumes of water from Lake Okeechobee into the St. Lucie River for almost eighty years, and the environmental impacts attributable to those discharges have existed since the 1950s. While it does not believe the stabilization doctrine of *Dickinson* applies in this case, defendant asserts that the application of that doctrine would nonetheless fail to invest the court with jurisdiction over plaintiffs' takings claims. Because each of the injuries alleged by plaintiffs first occurred decades ago, any claims related to those injuries would have accrued long before November of 2000. Finally, defendant rejects plaintiffs' argument that the federal navigational servitude never applies in flooding cases and asserts that the Federal Circuit's recent decision in *Louisiana Fish & Game III* supports the government's argument that plaintiffs' claims in this case are barred by the federal navigational servitude.

The court has received *amicus curiae* briefs from the City of Stuart, Florida, Martin County, Florida, and the South Florida Water Management District. The court heard oral argument on the parties' motions on December 4, 2009. The parties' motions are fully briefed and ripe for a decision by the court.

**DISCUSSION**

Plaintiffs assert that defendant's discharges have resulted in the physical taking of a number of protected property rights. Plaintiffs' allegations represent a number of distinct takings claims, which fall into two broad categories. First, plaintiffs have argued that the release of polluted water into the St. Lucie River through the S–80 control structure has harmed the river itself. According to plaintiffs, the environmental harm to the St. Lucie River has resulted in the physical taking of plaintiffs' asserted riparian right to pollution-free water in the river as well as their riparian rights to fish, swim, boat and view wildlife in the river. Second, plaintiffs have alleged that defendant's discharges have damaged certain of plaintiffs' upland parcels above the ordinary high water line. This second category includes the claims related to the alleged flooding of the Guys' garage, the alleged contamination of the Barattas' well, the alleged destruction of Ann MacMillan's mangrove trees and the alleged invasion of certain of plaintiffs' properties by noxious odors from the river. Because there are a number of legally significant distinctions between the two classes of plaintiffs' takings claims, the court will address these two classes of claims separately. Plaintiffs' claims alleging a taking of their riparian rights due to the environmental degradation of the St. Lucie River are addressed in Section II. Plaintiffs' remaining claims alleging a physical invasion of certain of their upland parcels are addressed in Section III.

**I. Standards of Review**

**A. Standard of Review under RCFC 12(b)(1)**

 In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Patton v. United States*, 64 Fed.Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236, 94 S.Ct.

1683). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461–62 (Fed.Cir. 1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed.Cir.2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

## B. Standard of Review under RCFC 56

■■■ "[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987) (internal quotations and citations omitted). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■■■ "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting former version of Fed. R.Civ.P. 56(c)). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984) (noting that a party's bare assertion that a fact is in dispute is not sufficient to create a genuine issue of material fact). "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag*, 731 F.2d at 836. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## II. Claims Alleging a Taking of Plaintiffs' Riparian Rights

Plaintiffs allege that defendant's discharges of polluted non-saline water into the St. Lucie River have taken their riparian rights by causing the environmental condition of the river to deteriorate. Defendant responds that plaintiffs' claims related to the environmental condition of the river are untimely because they accrued more than six years before the instant suit was filed. In addition, defendant claims that plaintiffs have failed to demonstrate that they possess a compensable property right under state law in the use or condition of the St. Lucie River. In the alternative, defendant argues that plaintiffs'

claims alleging a taking of any state-created riparian rights are preempted by the federal navigational servitude.

### A. Defendant's Motion to Dismiss— Timeliness of Plaintiffs' Claims

The Fifth Amendment of the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Pursuant to the Tucker Act, this court has exclusive jurisdiction over all takings claims against the United States seeking more than $10,000 in compensation. 28 U.S.C. § 1491(a)(1) (2006). Defendant has filed a motion to dismiss the instant suit under RCFC 12(b)(1) on the basis that certain of plaintiffs' claims sound in tort and are therefore beyond this court's limited jurisdiction under the Tucker Act. Because that argument does not apply to the alleged taking of plaintiffs' riparian rights due to the environmental degradation of the St. Lucie River, it will not be addressed in this section.

In addition to defendant's original jurisdictional challenge to plaintiffs' claims, the court also directed the parties to address the separate jurisdictional issue of timeliness. See Arctic Corner, Inc. v. United States, 845 F.2d 999, 1000 (Fed.Cir.1988) (holding that a trial court must raise the question of its own jurisdiction sua sponte whenever it appears to be in doubt). For the reasons discussed below, the court holds that plaintiffs' claims alleging a taking of their riparian rights accrued more than six years before the instant suit was filed and are therefore untimely. Accordingly, those claims are dismissed for lack of jurisdiction.

#### 1. Applicable Legal Framework

▮ A suit for just compensation under the Fifth Amendment must be filed in this court within six years of the date on which the takings claim first accrues. 28 U.S.C. § 2501 (2006). The six-year statute of limitations is jurisdictional and cannot be waived by the government. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (holding that the court's statute of limitations is jurisdictional in nature and is thus not subject to waiver or estoppel). Plaintiffs filed the instant suit on November 13, 2006. In order to be considered timely under 28 U.S.C. § 2501, plaintiffs' claims must have accrued no earlier than November 13, 2000. If plaintiffs' claims accrued before that date, then this court is without jurisdiction to hear them.

▮ In general, a claim against the government under the Tucker Act first accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed.Cir.1988). In determining whether plaintiffs knew, or should have known, of the requisite factual predicates establishing the government's alleged liability in this case, the court must apply an objective standard. See Fallini v. United States, 56 F.3d 1378, 1380 (Fed.Cir.1995) (holding that "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue"). Because plaintiffs bear the burden of establishing subject matter jurisdiction, they must demonstrate by a preponderance of the evidence that they could not have reasonably known of the facts fixing defendant's alleged liability prior to November 13, 2000.

When the government physically appropriates or permanently occupies private property for a public use, the date of claim accrual is usually clear. See, e.g., United States v. Dow, 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) ("The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking."). When a public project gradually results in cumulative physical damage to private property over a long period of time, however, it may be difficult to ascertain the precise date on which the takings claim first accrued. In Dickinson, 331 U.S. at 748–49, 67 S.Ct. 1382, the United States Supreme Court held that the six-year statute of limitations does not begin to run in such circumstances until the situation has become "stabilized." When damage to private property is the direct result of a gradual

physical process caused by the government's actions,

> there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.

*Id.* at 749, 67 S.Ct. 1382. The stabilization doctrine is designed to ensure that "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Id.*

Plaintiffs argue that the stabilization doctrine should be applied in this case because the alleged environmental damage to the St. Lucie River has been "gradual and intermittent." Pls.' Suppl. Brief at 19. According to plaintiffs, defendant operated the C & SF Project for many years with "little or no adverse impacts on South Florida water ecology." *Id.* at 19–20. Plaintiffs further claim that in recent years, however, defendant's massive discharges of polluted lake water into the St. Lucie River have had substantial adverse impacts on the natural condition of the estuary. According to plaintiffs, the gradual environmental degradation of the St. Lucie River caused by those discharges did not stabilize until September of 2004. If plaintiffs are correct in asserting that their takings claims first accrued in 2004, then their suit was filed within the applicable limitations period.

According to defendant, the common elements necessary for application of the stabilization doctrine set forth in *Dickinson* are as follows: (1) a continuing physical process that results in a direct invasion of a landowner's property; (2) an inability to reasonably foresee whether the physical invasion is permanent in duration; and (3) an inability to reasonably foresee the portion of the landowner's property that will be affected by the government's permanent physical invasion. Def.'s Suppl. Brief at 12. Defendant argues that the stabilization doctrine should not be applied in this case because there is no evidence that plaintiffs' land has been physically invaded by defendant's discharges into the St. Lucie River. Although the government argues strenuously against utilization of the stabilization doctrine in this case, neither of the parties has proposed a potential date of claim accrual that is not dependent upon the application of this doctrine. Although defendant claims that the doctrine established in *Dickinson* does not supplant traditional accrual principles, it fails to discuss how those principles might apply to the facts of the present case to the exclusion of the stabilization doctrine.

Finally, and in fact determinative of this issue, the Federal Circuit recently applied the stabilization doctrine in a physical takings case involving facts quite similar in many respects to those present in this case. *See N.W. La. Fish & Game Pres. Comm'n v. United States,* 446 F.3d 1285, 1290–91 (Fed. Cir.2006) (*Louisiana Fish & Game I*) (applying the stabilization doctrine to a takings claim alleging that the federal government's refusal to lower the level of a navigable river resulted in uncontrolled aquatic weed growth in an adjacent lake located on property managed by a state wildlife commission). The court therefore concludes that the stabilization doctrine is likewise applicable to plaintiffs' takings claims in this case.

Under the stabilization doctrine articulated in *Dickinson,* a claim seeking just compensation for a gradual physical taking does not accrue until "the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling v. United States,* 220 F.3d 1365, 1372 (Fed.Cir.2000). In other words, a claim for a gradual physical taking does not accrue until two separate conditions are met. First, it must be reasonably apparent that the government's physical invasion is permanent in duration. Second, the ultimate extent of the damage caused by the government's actions must be reasonably foreseeable. The six-year statute of limita-

tions does not begin to run until both of these conditions have been met.

The Federal Circuit has further held, however, that the accrual of a takings claim may be postponed by ongoing governmental efforts to repair or mitigate the environmental damage attributable to its actions to the extent that such efforts create "justifiable uncertainty" regarding the permanence of the physical invasion. *Applegate v. United States*, 25 F.3d 1579, 1583–84 (Fed.Cir.1994). Here, if the permanence of defendant's alleged invasion was reasonably apparent before November 13, 2000, and if the ultimate extent of the environmental damage caused by that invasion was reasonably foreseeable prior to that date, in order to avoid being barred by the statute of limitations, plaintiffs would have to demonstrate that governmental mitigation efforts postponed the accrual of their takings claims until after that date. The following discussion analyzes and applies the applicable legal framework, as outlined above, to the facts of the present case.

## 2. Timeliness of Claims Alleging a Taking of Plaintiffs' Riparian Rights

### a. Permanence of the Physical Invasion

High volumes of non-saline water from Lake Okeechobee have been discharged into the St. Lucie River through the S–80 control structure in almost every year since 1931. Ferguson 2d Suppl. Decl. Table 1. The releases into the river were initially made by the Everglades Drainage District. In 1937, the federal government assumed control of the Okeechobee Waterway and became responsible for the operation of the S–80 control structure. Although the annual discharges through the S–308 and S–80 control structures in 2003 through 2005 were relatively high due to unusually high precipitation and lake inflows during those years, Zediak Decl. ¶ 2, defendant points out that the total discharges during that period were significantly lower than its discharges in many prior years.[7] Between 1931 and 2008, for example, annual discharges into the St. Lucie River through the S–80 control struc-

ture exceeded 400 billion gallons in fifteen different years, and discharges exceeded one *trillion* gallons in 1960. Ferguson 2d Suppl. Decl. Table 3. Although the annual discharges into the St. Lucie River through the S–80 control structure in 2004 and 2005 were significantly higher than the releases during the immediately preceding years, those two years rank only twenty-eighth and sixteenth, respectively, in annual discharges between 1931 and 2008. Ferguson 2d Suppl. Decl. Table 3. In fact, annual discharges through S–80 in 1947, 1959 and 1960 *each* exceeded the total discharges in 2003, 2004 and 2005 *combined. Id.* According to defendant, the amount of water released from Lake Okeechobee into the St. Lucie River between 2003 and 2005 was not unprecedented—nor even particularly unusual—when viewed in historical context. In short, defendant asserts that the volume and permanence of its discharges into the St. Lucie River have been apparent for decades.

■ The U.S. Supreme Court has noted that "[p]roperty is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *Dickinson*, 331 U.S. at 748, 67 S.Ct. 1382. The court must therefore determine when the permanence of defendant's discharges became sufficiently apparent such that plaintiffs should reasonably have known that a significant burden had been imposed upon their riparian interests. In that regard, plaintiffs should have been aware of the permanence of defendant's discharges into the St. Lucie River long before November 13, 2000. Defendant has released lake water into the river in almost every year since assuming control of the Okeechobee Waterway in 1937, and plaintiffs have presented no evidence suggesting a reasonable basis for believing that the discharges would ever be terminated. In fact, plaintiffs note that "[e]ven the Government concedes that the Corps has no plans to change its operation of Lake Okeechobee to stop the destructive releases of polluted water in the St. Lucie."

---

7. The annual discharge statistics for the S–80 control structure cited by the government were

not challenged or otherwise disputed by plaintiffs.

Pls.' Reply at 18. In view of the foregoing, the court finds that the permanence of defendant's discharges into the river was apparent before November 13, 2000.

### b. Reasonable Foreseeability of Damage

■ Although the stabilization doctrine may sometimes delay the date of claim accrual, the Federal Circuit has emphasized that a takings claimant may not be permitted to wait until all of the alleged damage caused by the government's action has occurred before filing suit. On the contrary,

> stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, *not when the process has ceased or when the entire extent of the damage is determined.* Thus, during the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run.

*Boling*, 220 F.3d at 1370–71 (emphasis added); *see also Nadler Foundry & Mach. Co. v. United States*, 143 Ct.Cl. 92, 164 F.Supp. 249, 251 (1958) (holding that the rule set forth in Dickinson does not allow a plaintiff in a gradual takings case to wait until the risk of further damage has been completely removed before filing suit). In short, plaintiffs must demonstrate that they could not have reasonably foreseen the degree of damage that would be caused by defendant's discharges prior to November 13, 2000.

Plaintiffs argue that the environmental damage to the estuary did not stabilize until September of 2004. Pls.' Suppl. Brief at 2–3. Plaintiffs assert that the environmental effects of defendant's discharges first became apparent in the late 1990s, and the negative consequences of those releases dramatically increased between 2003 and 2005, dealing an irreversible "knock-out blow" to the estuary in 2004. *Id.* at 2; Henderson Decl. ¶ 10. In 2004, for example, when defendant released 190 billion gallons of water from Lake Okeechobee into the St. Lucie Canal, the salinity level of the St. Lucie River near the Roosevelt Bridge fell to zero for an extended period of time, the river experienced large algal blooms, and state officials issued warnings against swimming in the river due to high levels of fecal coliform bacteria. Pls.' Suppl. Brief at 2–3. In 2005, moreover, when defendant released more than 300 billion gallons of water from the lake, county health officials issued multiple warnings against any physical contact with the St. Lucie River and posted "no swimming" signs along the North Fork of the river. *Id.* at 3–4. Plaintiffs further claim that defendant's discharges in 2005 resulted in the death of an estimated 116 acres of oyster beds and massive fish kills. *Id.* at 4, 7, 12–13. Because the adverse impacts of defendant's discharges did not, according to plaintiffs, become stabilized until 2004, plaintiffs claim that the present suit was filed well within the applicable limitations period.

Defendant responds that the ultimate extent of the damage caused by its discharges into the St. Lucie River was foreseeable far more than six years before the present suit was filed. In fact, defendant claims that all of the environmental impacts now alleged by plaintiffs have existed since at least the 1950s and were widely reported in contemporaneous newspaper articles, government reports and other publicly available documents. Def.'s Suppl. Brief at 18–24. Defendant attached as exhibits to its supplemental brief a number of articles, letters and reports detailing the extensive environmental damage to the St. Lucie River allegedly caused by defendant's discharges. *Id.* Exs. E to R.

The court finds that the undisputed evidence presented by defendant demonstrates that the asserted environmental damage to the St. Lucie River had occurred and was in evidence almost fifty years before plaintiffs filed their complaint, and repeatedly occurred thereafter. Although plaintiffs make a number of conclusory statements that appear to contradict defendant's evidence on this issue, plaintiffs have presented no relevant evidence to support those statements. Plaintiffs claim, for example, that defendant's *recent* discharges of polluted non-saline water into the St. Lucie River have caused the

disappearance of fish, oysters, sea grasses and other organisms that can survive only within a narrow salinity range. *See, e.g.,* Pls.' Suppl. Brief at 19–20 (asserting that defendant operated the C & SF Project for many years "with little or no adverse impacts on South Florida water ecology"). As early as 1952, however, one local newspaper observed that "irreparable damage has been done to the St. Lucie River basin by siltation when [the] St. Lucie Canal has discharged into it in the past." Def.'s Suppl. Brief Ex. E.

Additionally, in a federal report on the St. Lucie Canal issued in 1957, defendant discussed longstanding local opposition to precisely the same environmental impacts now alleged by plaintiffs:

> Local interests have contended for many years that the release of lake-regulation discharges through the St. Lucie Canal causes serious damage to fishing and boating in the St. Lucie estuary.... [T]he turbid fresh-water discharges replace the brackish water in the river and cause many fish to leave the area; that marine life unable to leave is killed by the fresh water; and that sediment carried by the releases is deposited in the estuary.

Def.'s Suppl. Brief Ex. C at 10. That report also discussed the results of even earlier studies on the environmental impacts caused by defendant's discharges:

> Past studies of the sedimentation problem in [the] St. Lucie Canal have concluded that (1) the release of turbid fresh water through the canal seriously affects sport fishing and other recreational activities in the Stuart area; (2) during long discharge periods the salt water in the St. Lucie River is almost completely replaced by fresh water; (3) the releases carry fine sands, fragments of shell, and organic material into the St. Lucie estuary, much of which is deposited in the Palm City shoal; (4) an insignificant amount of sediment enters the estuary from uncontrolled drainage points and from the natural watershed of [the] St. Lucie River and its North and South Forks; (5) bank caving has contributed materially to the sediment load; and (6) in the mixing zone of fresh

and salt water, the colloidal matter carried by the fresh water precipitates into a dark gray flocculent which settles to the bottom in places where there are low current velocities and little turbulence, and after reaching the bottom compacts gradually into a sticky clay deposit that resists subsequent removal by currents and turbulence more effectively than do sand, shell, or noncolloidal silts.

*Id.* at 10–11. The environmental damage described in the 1957 report closely mirrors the injuries alleged in plaintiffs' complaint.

Defendant's discharges also received documented public attention in the 1970s. A Wall Street Journal editorial published in 1970, for example, noted that "the once-clear St. Lucie is black with mud, and Corps officials in Florida admit their agency is largely to blame. Nearly all the fish are gone. Gone, too, are most of the oysters, clams, pelicans, ospreys and wild ducks." Def.'s Suppl. Brief Ex. H at 1. In that same year, an internal memorandum prepared by defendant noted that its discharges through the St. Lucie Canal "erode the canal banks, fill the estuary with shoals, discolor the water, deny boating in the estuary, and drive out the fish each time regulatory discharges are required from Lake Okeechobee." Def.'s Suppl. Brief Ex. G at 2. In 1978, defendant held a public hearing on an interim regulation schedule for Lake Okeechobee. *See* Def.'s Suppl. Brief Ex. I. During that hearing, witnesses presented testimony concerning the damaging environmental consequences of defendant's discharges into the St. Lucie River. Specifically, those witnesses discussed the adverse impacts of the regulatory discharges on oysters, aquatic vegetation and fish communities. *Id.* at 65, 75–76.

In the 1980s and 1990s, the local community continued its attempts to limit or eliminate defendant's discharges into the St. Lucie River. In 1985, for example, the Board of Commissioners for *amicus* Martin County adopted a resolution requesting that defendant reduce the rate of regulatory discharges into the river. Def.'s Suppl. Brief Ex. J. The resolution noted that defendant's discharges damage sea grass beds and that "the loss of marine grass beds produce[s] long term neg-

238

ative impacts on both sport and commercial fisheries, wildlife, general ecology, quality of life and property values ... [.]" *Id.*

In 1991, a number of plaintiffs helped form the St. Lucie River Initiative (Initiative). As evidenced by the newsletters, news articles and other documents submitted by defendant, the Initiative has been tirelessly working for almost twenty years to stop defendant's discharges and to restore the environmental health of the St. Lucie River. *See* Def.'s Suppl. Brief Exs. K to S. There is no question that plaintiffs have been acutely aware of the effects of defendant's discharges on the river for many years.

Plaintiffs' assertion that the current environmental damage to the river is qualitatively different from the damage that occurred in earlier years and did not "peak" until 2004 or 2005 is irrelevant to the applicable legal standard for determining whether plaintiffs' claims are timely. *See* Pls.' Mot. at 14; Pls.' Suppl. Brief at 4 (claiming that defendant's "record-high levels of discharges in 2004 and 2005 essentially dealt a 'knock-out blow' to the St. Lucie from which it has never recovered"). As the Federal Circuit has observed, the "contention that *Dickinson* stands for the proposition that the filing of a lawsuit can be postponed until the full extent of the damage is known has been soundly rejected." *Bolling,* 220 F.3d at 1371. Plaintiffs must demonstrate that the damage to the river was not reasonably foreseeable more than six years before this suit was filed. The evidence in this case leads to the unavoidable conclusion that the environmental damage to the St. Lucie River was foreseeable—and, indeed, had already clearly manifested itself—prior to November 13, 2000.

### c. Governmental Mitigation Activities

■ Plaintiffs assert that the accrual of their takings claims was delayed by defendant's repeated promises to mitigate or eliminate the environmental damage to the St. Lucie River caused by its discharges. Pls.' Suppl. Brief at 21–24. Plaintiffs claim that a number of specific government actions resulted in justifiable uncertainty regarding the permanence of discharges into the river.

In 1994, for example, the state legislature passed the Everglades Forever Act, Fla. Stat. § 373.4592 (1994). Pls.' Suppl. Brief at 22. Pursuant to that law, defendant prepared an Everglades Reconnaissance Report, which discussed a number of alternative plans designed in part to reduce the impact of regulatory discharges on coastal estuaries. One of those options was referred to as Plan 6 and involved sending up to 7,000 cubic feet per second of lake water southward in a large sheet between the Miami and New River Canals. *Id.*

In 1998, defendant proposed the construction of a new 40,000–acre storage reservoir adjacent to the St. Lucie Canal (the C–44 Reservoir) to moderate damaging releases of polluted fresh water into the St. Lucie River. *Id.* at 22–23. Congress authorized the construction of the C–44 Reservoir in the Water Resources Development Act of 2000, Pub.L. No. 106–541, 114 Stat. 2572, and the president included funding for construction of the reservoir in the federal budget in 2000. Pls.' Suppl. Brief at 23.

Finally, defendant adopted a new lake regulation schedule in 2000, which was designed in part to reduce high-volume releases into the coastal estuaries by maintaining Lake Okeechobee at a lower stage. *See* Ferguson 2d Suppl. Decl. ¶ 12. The lake regulation schedule adopted in 2000, WSE, is the schedule that was in effect during the period in which plaintiffs allege their property interests were taken by defendant's discharges into the St. Lucie River. Plaintiffs claim that the adoption of WSE represented a promise that the environmental damage caused by defendant's discharges into the St. Lucie River would be mitigated.

Unfortunately, according to plaintiffs, none of the proposed mitigation measures ever had any significant impact on the damage caused by defendant's discharges. Plan 6 was never adopted, and the C–44 Reservoir was never constructed. Pls.' Suppl. Brief at 22–24. Plaintiffs also note that defendant's adoption of a new lake regulation schedule in 2000 predictably failed to mitigate the environmental damage to the St. Lucie River because it was based on faulty data. *Id.* at 24. Nonetheless, plaintiffs allege that defen-

dant's failed mitigation activities between 1994 and 2000 further postponed the accrual of their takings claims. *Id.* at 13–14, 21–22.

Defendant responds that none of the alleged mitigation measures referenced by plaintiffs could have produced any reasonable uncertainty regarding the predictability or permanence of defendant's discharges into the St. Lucie River. Def.'s Suppl. Brief at 24–27. According to defendant, Plan 6 never received congressional or agency approval and was just one of many alternatives considered and rejected by defendant during a comprehensive study of the C & SF Project. *Id.* at 25. The Everglades Reconnaissance Report merely concluded that further examination of a number of alternatives, including Plan 6, was appropriate. *Id.* In April 1999, moreover, defendant issued the C & SF Project Comprehensive Review Study Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (C & SF Restudy), which recommended against proceeding with Plan 6. *Id.*

Although the construction of the C–44 Reservoir was approved by Congress, defendant claims that the project was never expected to have a significant impact on regulatory discharges into the St. Lucie River. *Id.* at 26. On the contrary, the reservoir was designed to capture *local runoff* within the C–44 watershed and to provide fresh water to the St. Lucie River during periods of low rainfall. *Id.* at 25. Defendant points out that the maximum capacity of the proposed C–44 Reservoir would be approximately 13 billion gallons, which would accommodate only 3.25 percent of regulatory discharges through the St. Lucie Canal in years when releases through the S–80 control structure amounted to 400 billion gallons. *Id.* at 26; Ferguson 2d Suppl. Decl. ¶ 10. According to defendant, the construction of the C44 Reservoir would have no more than a negligible impact on discharges into the St. Lucie River and could not provide any reasonable basis for uncertainty regarding the permanence or frequency of those discharges.

Finally, defendant claims that the adoption of WSE was expected to represent only a "modest improvement" over the prior regulation schedule with respect to the impacts on

the St. Lucie River. Def.'s Suppl. Brief at 26. According to defendant, the primary purpose of maintaining Lake Okeechobee at a lower level, as contemplated under WSE, was to improve the environmental condition of *the lake. Id.* Defendant argues that high-volume discharges would be necessary under any regulation schedule in the absence of a dramatic increase in the system's storage capacity. *Id.* at 26–27; Ferguson 2d Suppl. Decl. ¶ 13. In other words, the adoption of a new regulation schedule for Lake Okeechobee could never, defendant argues, create justifiable uncertainty regarding the permanence or frequency of regulatory discharges into the St. Lucie River.

Despite the conflicting contentions by the parties, in the final analysis, the question of whether or not the government made promises to fix the problem is not dispositive of the claim-accrual issue. While it is true that public mitigation efforts creating justifiable uncertainty regarding the permanence of a governmental invasion of private property may postpone the accrual of a takings claim, such efforts cannot resurrect a stale takings claim years (or decades) after the applicable limitations period has expired. As noted above, defendant has been discharging water into the St. Lucie River since the 1930s, and the environmental consequences of those discharges have been apparent since at least the 1950s. The mitigation efforts cited by plaintiffs, on the other hand, did not commence until the mid–1990s. Thus, even if the mitigation efforts cited by plaintiffs could be viewed as reasonably raising an expectation of improvement, those hopes arrived too late in face of a long-expired statute of limitations. In view of the foregoing discussion, the court therefore holds that all of plaintiffs' claims alleging a taking of their riparian rights due to the environmental condition of the St. Lucie River are untimely and must be dismissed for lack of jurisdiction.

**B. Cross Motions for Summary Judgment**

As noted above, a party's motion for summary judgment should be granted if there is no genuine issue of material fact and that party is entitled to judgment as a matter of

law. RCFC 56(c); *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Plaintiffs have moved for summary judgment on the issue of liability, whereas defendant has moved for summary judgment on the basis that plaintiffs cannot meet their burden of proof on that issue. In support of its motion, defendant argues that plaintiffs have failed to demonstrate the existence of a compensable property right under Florida law. In addition, defendant further argues that any state-created riparian rights in the use or condition of the St. Lucie River are preempted by the federal navigational servitude.[8] Although the court has already found that plaintiffs' claims alleging a taking of their riparian rights due to the environmental degradation of the St. Lucie River are untimely, the court will nonetheless examine and address the merits of those claims as if they had been timely filed. For the reasons discussed below, defendant's motion for summary judgment with respect to those claims is granted, and plaintiffs' cross motion for summary judgment is denied.

## 1. Plaintiffs' Property Rights under Florida Law

The Federal Circuit has adopted a two-part approach for the analysis of takings claims. Before determining whether a particular governmental action has effected a taking of private property requiring the payment of just compensation, a court must first "inquire into the nature of the ... owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, *i.e.*, whether the ... use interest was a 'stick in the bundle of property rights' acquired by the owner." *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed.Cir.1995).

The first step of the analysis is a threshold inquiry. *See, e.g., Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir.2004) ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment."); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed.Cir.1993) (noting that as "part of a takings case, the plaintiff must show a legally-cognizable property interest"). If the court determines that the particular interest alleged to have been taken is not a cognizable property right to which the Fifth Amendment might apply, then the takings analysis can proceed no further.

In this case, plaintiffs assert the possession of two distinct property interests under state law. First, each plaintiff claims to hold fee simple title to the fast land located above the ordinary high water line of the adjacent navigable waterway.[9] In addition to the ownership of those upland parcels, each plaintiff further asserts the possession of certain riparian rights in the use and enjoyment of the adjacent navigable waterway as an incident of their fee simple ownership of riparian land.[10] According to plaintiffs, riparian landowners in Florida possess protected property rights in the use of an adjacent stream for fishing, swimming, boating and the viewing of wildlife. In addition to those recreational rights, plaintiffs also assert the possession of a compensable property right to pollution-free water in the St. Lucie River. Plaintiffs claim that defendant's discharges of polluted non-saline water into the river have deprived them of those property rights without the payment of just compensation as required under the Fifth Amendment.

---

**8.** Defendant also claims that its discharges did not cause the alleged environmental damage to the St. Lucie River because intervening natural events caused plaintiffs' injuries. Because the court concludes that plaintiffs' claims alleging a taking of their riparian rights are both untimely and barred by the federal navigational servitude, the court need not address defendant's causation arguments with respect to those claims.

**9.** Plaintiffs have presented no evidence that they are in fact the record owners of the upland parcels at issue in this case. For purposes of the pending motions, defendant has not disputed

plaintiffs' asserted ownership of those parcels. Def.'s Suppl. Brief at 9 n. 5.

**10.** The court notes that one of the plaintiffs in this case does not own riparian property adjacent to the St. Lucie River. John Patteson's property is located on the St. Lucie Canal. Patteson Decl. ¶ 1. Although a riparian landowner may possess riparian rights in an artificial canal, it is clear that Mr. Patteson does not possess any riparian rights in the use or condition of the St. Lucie River.

According to defendant, plaintiffs do not possess any compensable property rights in the use of the St. Lucie River under Florida law because such rights are held in common with the general public under the public trust doctrine. Because the asserted riparian rights are non-exclusive in nature, defendant contends that those rights are not compensable under the Fifth Amendment. In the alternative, defendant argues that the federal navigational servitude preempts any state-created riparian rights possessed by plaintiffs with respect to the use and enjoyment of the St. Lucie River. For these reasons, defendant argues that plaintiffs are not entitled to compensation for the alleged damage to the St. Lucie River.

■ The Takings Clause of the Fifth Amendment does not create property rights. Rather, such rights " 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....' " *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *see also Bartz v. United States*, 224 Ct.Cl. 583, 633 F.2d 571, 577 (1980) (noting that "the issue of what constitutes a 'taking' is a 'federal question' governed entirely by federal law, but ... the meaning of 'property' as used by the Fifth Amendment will normally obtain its content by reference to state law") (citing *Johnson v. United States*, 202 Ct.Cl. 405, 479 F.2d 1383, 1390 (1973)).[11] In determining whether plaintiffs hold a compensable property interest in the use and enjoyment of the St. Lucie River, the court must examine the nature and scope of riparian property rights under applicable state law.

■ Under Florida law, all navigable waterways as well as the submerged lands beneath them are held in trust by the state for the benefit of the general public. *See Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n*, 57 Fla. 399, 48 So. 643, 644 (1909) *(Ferry Pass)*

(holding that the state, "by virtue of its sovereignty holds in trust for all the inhabitants of the state the title to the lands under the navigable waters within the state including the shore or space between high and low water marks"); *see also* Fla. Const. Art. X, § 11 ("The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people.").

■ Although the state may convey legal title to submerged lands to private owners, any rights thus conveyed are always subject to the state's overriding obligation to protect the public rights of swimming, bathing, fishing and navigation. The Florida Supreme Court has noted that

[t]he navigable waters in the state and the lands under such waters, including the shore or spaces between ordinary high and low water marks, are the property of the state or of the people of the state in their united or sovereign capacity. Such lands are not held for purposes of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the state for purposes of navigation, commerce, fishing, and other useful purposes afforded by the waters thereon.

*Brickell v. Trammell*, 77 Fla. 544, 82 So. 221, 226 (1919). Plaintiffs do not own, nor do they claim to own, the St. Lucie River. They do, however, claim to own several parcels of riparian land, as well as a number of appurtenant riparian rights in the use and environmental condition of the St. Lucie River. Specifically, plaintiffs claim to possess compensable property rights in the use of the river for swimming, boating, fishing and wildlife viewing. Plaintiffs also assert a compensable property right to pollution-free water within the river. The court will address each of plaintiffs' asserted property interests *seriatim*.

---

11. Although property rights are generally defined by state law, federal law may also create compensable property interests protected by the Fifth

Amendment. *See Conti v. United States*, 291 F.3d 1334, 1340 n. 4 (Fed.Cir.2002).

### a. Fishing, Swimming, Boating and Recreational Rights

Plaintiffs first argue that defendant's discharges into the St. Lucie River have effected a physical taking of their riparian rights to swim, fish, view wildlife and operate their boats in the St. Lucie River. Defendant responds that those navigational and recreational rights are held in common with the general public and are therefore non-compensable under the public trust doctrine. Although plaintiffs do not argue that their swimming, fishing and boating rights are in any way superior to the concurrent rights of the public to engage in those activities, they nonetheless maintain that such rights cannot be taken from riparian landowners without the payment of just compensation.

The court notes at the outset that plaintiffs have failed to cite any legal authority supporting the existence of a compensable property right in a riparian landowner's ability to observe wildlife in a navigable waterway. Although plaintiffs might derive an economic benefit from the ability to view wildlife from their property, the Supreme Court has noted that

> not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion. The law has long recognized that the right of ownership in land may carry with it a legal right to enjoy some benefits from adjacent waters. But that a closed catalogue of abstract and absolute 'property rights' in water hovers over a given piece of shore land, good against all the world, is not in this day a permissible assumption.

*United States v. Willow River Power Co.,* 324 U.S. 499, 502, 65 S.Ct. 761, 89 L.Ed. 1101 (1945). The plaintiff in a takings case bears the burden of proving the existence of a cognizable property right. Because there is no apparent legal basis for plaintiffs' assertion of a right to view wildlife in the St. Lucie River, the court must dismiss plaintiffs' claims with respect to the taking of that purported property interest.

While Florida courts have traditionally recognized riparian rights to swim, bathe, navigate and fish in navigable waters, they have uniformly held that those rights are not exclusive because they are held concurrently with the general public. *See Walton County v. Stop the Beach Renourishment, Inc.,* 998 So.2d 1102, 1111 (Fla.2008), *cert. granted,* —— U.S. ——, 129 S.Ct. 2792, 174 L.Ed.2d 290 (2009) (noting that "upland owners have no rights in navigable waters and sovereignty lands that are superior to other members of the public in regard to bathing, fishing, and navigation"); *Ferry Pass,* 48 So. at 645 ("As to mere navigation in and commerce upon the public waters, riparian owners as such have no rights superior to other inhabitants of the state."). However, plaintiffs point to a number of cases ostensibly supporting the proposition that the deprivation of a non-exclusive riparian right by the government requires the payment of just compensation under the Fifth Amendment. As discussed below, the referenced cases provide no support for the arguments advanced by plaintiffs in this case.

In *Game & Fresh Water Fish Comm'n v. Lake Islands, Ltd.,* 407 So.2d 189 (Fla.1981) (*Lake Islands* ), cited by plaintiffs, the Florida Supreme Court invalidated an administrative regulation prohibiting the use of motorboats and air boats on a navigable lake during duck hunting season. *Lake Islands* is inapposite for at least two reasons. First, the court in that case did not address whether the challenged regulation effected a compensable taking of a protected property right. On the contrary, the court held that the regulatory prohibition was an arbitrary and unreasonable restriction that violated the minimal requirements of due process. Second, the court found that the challenged prohibition had the effect of completely depriving the plaintiffs, owners of islands within the lake, access to their property. As discussed in more detail below, the right of access is one of four special riparian rights that is not shared with the general public.

Plaintiffs further claim that *Walton County,* 998 So.2d at 1111–12, and *Broward v. Mabry,* 58 Fla. 398, 50 So. 826, 830 (1909), both stand for the proposition that riparian

rights "whether or not held in common with the public, are property and may not be taken without just compensation...." Pls.' Mot. at 25–26. However, neither of those decisions supports plaintiffs' assertion. In *Walton County,* for example, the Florida Supreme Court stated that there are only four exclusive riparian rights that cannot be taken by the government without the payment of just compensation. 998 So.2d at 1111. The court expressly noted, moreover, that riparian owners do not possess any fishing, bathing or navigation rights that are superior to the rights held by the public. *Id.*

Plaintiffs quote the following passage from *Broward* in support of their argument that non-exclusive riparian rights are compensable under the Fifth Amendment:

Those who own land extending to [the] ordinary high-water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, etc., common to the public, have in general certain special rights in the use of waters opposite their holdings; among them being the right of access from the water to the riparian land and perhaps other easements allowed by law. These special rights are easements incident to the riparian holdings, and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law.

*Broward,* 50 So. at 830. The quoted language, however, merely states that the "special riparian rights"—*i.e.,* the rights of access, unobstructed view, reasonable domestic use and additions due to accretion and reliction—are easements that may not be taken without compensation. The passage does not suggest that the public trust rights of navigation, commerce, fishing and boating are likewise compensable, and specifically draws a distinction between them and the so-called "special rights."

The remaining cases cited by plaintiffs likewise fail to support their assertion of a compensable property right to fish, boat, swim or view wildlife in a navigable waterway. *See Bd. of Trustees of the Internal Improvement Trust Fund v. Sand Key As-*

*socs., Ltd.,* 512 So.2d 934 (Fla.1987) (*Sand Key Associates* ) (holding in a quiet title action that littoral owners are entitled to additions to their upland parcels caused by government-induced accretion); *Hayes v. Bowman,* 91 So.2d 795 (Fla.1957) (determining the respective property rights of two owners of littoral land adjacent to a navigable bay); *Webb v. Giddens,* 82 So.2d 743 (Fla.1955) (holding that the construction of a road across an arm of a navigable lake, which completely eliminated the plaintiff's access to the main body of the lake from his property, was a deprivation of the plaintiff's special littoral right of access); *Bd. of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc.,* 272 So.2d 209 (Fla.2d Dist.Ct.App.1973) (*Medeira Beach Nominee* ) (holding that littoral owners acquired title to new beachfront land created through a public beach renourishment programs).

██ Plaintiffs have failed to demonstrate the existence of a compensable property right under Florida law regarding the ability to fish, swim, bathe, view wildlife or operate a boat in navigable waters. Florida case law draws a clear distinction between exclusive riparian rights, which are compensable, and public trust rights, which are not. A Florida appellate court, for example, held that the loss of a public trust right by a riparian owner "amounts to a deprivation of a right of navigation which will affect the public as a whole ... [and that] eminent domain statutes protect only private rights; not rights which accrue to the public as a whole." *Cent. & S. Fla. Flood Control Dist. v. Griffith,* 119 So.2d 423, 425 (Fla.3d Dist.Ct.App.1960).

The United States Court of Claims, the predecessor of the Federal Circuit, has also rejected takings claims in which a landowner asserted the possession of a compensable property right in the ability to hunt or to fish in navigable waters:

[i]t has been uniformly held that there is no property right in any private citizen or group to wild game or to freely-swimming migratory fish in navigable waters. Fish are *ferae naturae,* capable of ownership only by possession and control. No citizen has any right to the fish nor to exclude any

other citizen from an equal opportunity to exercise his right to possession. *Tlingit & Haida Indians of Alaska v. United States,* 182 Ct.Cl. 130, 389 F.2d 778, 785 (1968). In *Bishop v. United States,* 130 Ct. Cl. 198, 126 F.Supp. 449, 451 (1954), moreover, the court held that the "[p]laintiffs' allegation ... that the right to hunt wild geese is a property right cannot be taken seriously.... No citizen has a right to hunt wild game except as permitted by the State." The property owners in *Bishop,* moreover, were claiming a right to hunt geese on their own land. If there is no protected property right to hunt wild animals on one's own property, then there can certainly be no such right to fish in navigable waters that are under the exclusive control of the state.

### b. Exclusive or Special Riparian Rights

 Although the state's navigable waterways are not themselves subject to private ownership or control, the owners of riparian land do possess certain rights in the use of those waterways as an incident of their ownership. In addition to the rights held in common with the general public, the owners of riparian property possess four exclusive property rights with respect to the adjacent body of water. *See generally Walton County,* 998 So.2d at 1111. First, riparian landowners have a protected right to access the adjacent waterway from their upland parcels. *Lake Islands,* 407 So.2d at 191–93 (holding that a regulation prohibiting boats on a navigable lake during duck hunting season unreasonably deprived the owners of islands within that lake access to their property from the water). Second, riparian owners possess the right to divert a reasonable amount of water from the adjacent waterway for domestic purposes. *Cf. Taylor v. Tampa Coal Co.,* 46 So.2d 392, 394 (Fla.1950) (holding that a riparian landowner on a non-navigable lake possessed a right to use the water in the lake only to the extent that such use did not interfere with the enjoyment of an equal right by other riparians). Third, the owners of riparian land are entitled to gradual additions to their property resulting from the natural processes of accretion and reliction. *Medeira Beach Nominee,* 272 So.2d at 211–12 (holding that a littoral property owner was entitled to accreted land created by a public beach renourishment program). Finally, riparian landowners possess a right to an unobstructed view of the water from their upland property. *Lee County v. Kiesel,* 705 So.2d 1013, 1015–16 (Fla.2d Dist.Ct.App. 1998) (holding that the construction of a bridge that completely blocked a riparian landowner's view of the water effected a taking of the special right of unobstructed view). Although these four special rights are subject to reasonable regulation by the government, they "are private property rights that cannot be taken from upland owners without just compensation." *Walton County,* 998 So.2d at 1111; *see also Brickell,* 82 So. at 227 (holding that the four riparian rights listed above "are easements incident to the riparian holdings and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law").

 Plaintiffs do not claim that the challenged discharges have deprived them of access to the river from their upland property, an unobstructed view of the river from that property, or additions to their parcels due to accretion or reliction. Plaintiffs continue to enjoy each of those special rights without interference. Plaintiffs do argue, however, that the special riparian right to reasonable use of the water must be interpreted to include all uses of the navigable waterway, including fishing, swimming, boating and viewing wildlife. The court does not view the relevant case law as supporting plaintiffs' expansive interpretation of the right of reasonable use. Plaintiffs have failed to cite any controlling decisions which support their contentions and, indeed, pertinent case law discerned by the court has also failed to yield support. In *Ferry Pass,* 48 So. at 645, for example, the Florida Supreme Court described the right of reasonable use as "the right to a reasonable use of the water for domestic purposes." *See also Lake Islands,* 407 So.2d at 191 (noting that riparian landowners possess "the right to a reasonable use of the water for domestic purposes").

The only cases that might initially appear to support plaintiffs' interpretation are clearly distinguishable from the case at bar. In

cases addressing the littoral or riparian rights held by owners of land adjacent to *non-navigable* lakes and streams, Florida courts have generally held that such landowners do possess a compensable property right in the recreational or navigational use of the adjacent body of water.[12] In *Taylor*, 46 So.2d 392, for example, the Florida Supreme Court held that owners of land abutting a non-navigable lake possess an enforceable property right in any lawful and reasonable use of the water in the lake, as long as the exercise of that right does not interfere with the equal rights of other riparians:

> It is the rule that the rights of riparian proprietors to the use of waters in a non-navigable lake such as the one here involved are equal. Except as to the supplying of natural wants, including the use of water for domestic purposes of home or farm, such as drinking, washing, cooking, or for stock of the proprietor, each riparian owner has the right to use the water in the lake for all lawful purposes, so long as his use of the water is not detrimental to the rights of other riparian owners.... The fact that one riparian owner may choose to use the water in the lake for recreational purposes while another may desire to divert it for an artificial use such as irrigation, will not give the latter a superior right to take water to the detriment of the former, for in this jurisdiction there is no distinction in respect to use between a farm and a summer residence.

*Id.* at 394 (internal citation omitted). Because the general public does not possess any right to use non-navigable waterways for recreation or navigation, however, those rights are properly viewed as compensable property rights that are held exclusively by the owners of adjacent riparian or littoral land. Taylor and other similar cases do not apply here,

where any rights of recreation or navigation are held in common with the general public.

### c. Plaintiffs' Asserted Right to Pollution–Free Water

 Plaintiffs claim to possess a compensable property right under Florida law to pollution-free water in the St. Lucie River and argue that defendant has taken that right because the water discharged into the river contains high concentrations of nutrients and sedimentary material.[13] Compl. ¶ 31. In support of that assertion, plaintiffs point to ten words embedded within an extended passage in a 100–year-old decision of the Florida Supreme Court:

> Among the common-law rights of those who own land bordering on navigable waters apart from rights of alluvion and dereliction are the right of access to the water from the land for navigation and other purposes expressed or implied by law, the right to a reasonable use of the water for domestic purposes, the right to the flow of the water without serious interruption by upper or lower riparian owners or others, *the right to have the water kept free from pollution,* the right to protect the abutting property from trespass and from injury by the improper use of the water for navigation or other purposes, the right to prevent obstruction to navigation or an unlawful use of the water or of the shore or bed that specially injures the riparian owner in the use of his property, the right to use the water in common with the public for navigation, fishing, and other purposes in which the public has an interest.

*Ferry Pass*, 48 So. at 644–45 (emphasis added). The quoted passage was subsequently reproduced in its entirety in the Florida Supreme Court's decision in *Lake Islands*, 407 So.2d at 191. There is no question that the language cited by plaintiffs constituted *obiter dicta* in both *Ferry Pass* and *Lake Islands.*

---

**12.** As previously noted, the parties are in agreement that the St. Lucie River is a navigable waterway.

**13.** Plaintiffs also claim that the addition of non-saline water into the St. Lucie River has effected a taking of their riparian rights by altering the existing salinity level within the river. The Federal Circuit, however, has rejected the existence

of such a right, *see Avenal v. United States*, 100 F.3d 933, 936–37 (Fed.Cir.1996) (holding that the plaintiffs did not suffer a compensable taking when a government project changed the salinity level of a navigable waterway in which those plaintiffs held leases to cultivate oysters), and plaintiffs have cited no authority that supports the existence of such a right under state law.

Neither of those cases required the court to recognize the existence of a protected property right in pollution-free water.

The Federal Circuit has noted that "it is well established that a general expression in an opinion, which expression is not essential to the disposition of the case, does not control a judgment in a subsequent proceeding." [14] *Smith v. Orr*, 855 F.2d 1544, 1550 (Fed.Cir.1988); *see also Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir.2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *United States v. Hunter*, 172 F.3d 1307, 1310 (11th Cir.1999) (Carnes, J., concurring) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision."). Because the statements cited by plaintiffs were not essential to the dispositions in *Ferry Pass* and *Lake Islands*, this court is not bound by those statements in interpreting and applying Florida law.

■ Plaintiffs have failed to cite a single case in which a Florida court has held that

the pollution of a navigable waterway by a governmental entity effected a compensable taking of property.[15] The pollution of the St. Lucie River, moreover, does not inflict any special injury on plaintiffs; it is an injury that is sustained by the general public. As noted in the *amicus* brief filed by the South Florida Water Management District, the Florida Constitution grants all citizens of the state an equal right to adequate laws for the abatement of water pollution. *See* Amicus Brief of the South Florida Water Management District at 6; *see also* Fla. Const. Art. II, § 7. Because any legal interest in pollution-free water is shared equally by all Florida residents, any infringement of that interest is not compensable as a taking under the Fifth Amendment.[16]

The court further notes that awarding compensation to plaintiffs for the alleged taking of a "property right" that is held in common with the general public would be inconsistent with the compensatory purposes of the Takings Clause. The Supreme Court has observed that the "Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from

14. The cautionary words of one Florida court on this issue are particularly instructive:

> The bench and bar not infrequently fall into the error of accepting as binding precedent all of the views expressed in the written opinion of an appellate court. Necessarily, the views and decisions of an appellate court on issues which are properly raised and decided in disposing the case are, unless reversed or modified by a higher court, binding on the lower court as the law of the case. Additionally, under the doctrine of stare decisis, an appellate court's decision on issues properly before it and decided in disposing of the case, are, until overruled by a subsequent case, binding as precedent on courts of lesser jurisdiction. But a purely gratuitous observation or remark made in pronouncing an opinion and which concerns some rule, principle or application of law not necessarily involved in the case or essential to its determination is obiter dictum, pure and simple. While such dictum may furnish insight into the philosophical views of the judge or the court, it has no precedential value.

> *Bunn v. Bunn*, 311 So.2d 387, 389 (Fla. 4th Dist.Ct.App.1975).

15. In their supplemental brief, plaintiffs cite a 1999 decision from one of the state's intermediate appellate courts as standing for the proposi-

tion that the government's pollution of a navigable waterway effects a taking of the property rights of riparian landowners. Pls.' Suppl. Brief at 2. The only issue discussed in the referenced opinion is whether a particular parcel of property was riparian or not; the opinion does not, directly or indirectly, address whether there is a riparian right under state law to pollution-free water. *See Teat v. City of Apalachicola*, 738 So.2d 413 (Fla. 1st Dist.Ct.App.1999).

16. In addition to lacking any substantial basis in existing law, the radical redefinition of riparian rights proposed by plaintiffs would be unworkable in practice. While the abatement of water pollution is an important public policy that is codified in the state's constitution, *see* Fla. Const. Art. II, § 7(a), the complete elimination of pollution from Florida's navigable waters would be incompatible with a number of other state and federal policies and objectives. For example, National Pollutant Discharge Elimination System (NPDES) permits issued pursuant to Section 402 of the Clean Water Act expressly authorize the discharge of pollutants into navigable waters. *See* 33 U.S.C. § 1342 (2001). If the court were to recognize a compensable property right in pollution-free water, each of the thousands of NPDES permits issued in Florida would represent a potentially compensable taking of property requiring compensation.

forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *see also Monongahela Navigation Co. v. United States,* 148 U.S. 312, 325, 13 S.Ct. 622, 37 L.Ed. 463 (1893) (noting that the Takings Clause "prevents the public from loading upon one individual more than his just share of the burdens of government"). In seeking compensation for the alleged taking of their asserted right to pollution-free water, plaintiffs would turn the *Armstrong* principle on its head. In essence, plaintiffs seek individual compensation for burdens that are shared by the public as a whole. Such a holding would be unprecedented and one for which this court finds no authority.

### 2. Federal Navigational Servitude

Defendant argues that even if plaintiffs possess compensable property rights in the use and condition of the St. Lucie River under Florida law, their riparian takings claims are nonetheless barred by the federal navigational servitude. Plaintiffs respond that the federal navigational servitude is inapplicable in this case for two reasons. First, plaintiffs claim that defendant's discharges into the river are unrelated to navigation and are therefore beyond the scope of the navigational servitude. In that regard, plaintiffs contend that flood control, not navigation, is the primary purpose of defendant's regulatory releases from Lake Okeechobee. Second, plaintiffs argue that the navigational servitude never applies in flooding cases. According to plaintiffs, the navigational servitude may not be invoked as a defense in this case because defendant's discharges have the effect of flooding the St. Lucie River. Contrary to plaintiffs' assertions, the court concludes that the federal navigational servitude operates in this case as an inherent limitation on plaintiffs' riparian rights, and any claims alleging the taking of those rights are therefore barred by the servitude.

### a. Applicable Legal Framework

■ In *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court held that the government "may resist compensation ... if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." In other words, if governmental action results in restrictions on the use of property that merely duplicate limitations that already "inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon ... ownership," then there can be no taking. *Id.* at 1029, 112 S.Ct. 2886. The background principles defense to a takings claim is not limited to state nuisance and property law; on the contrary, such principles may have their basis in federal law. *See, e.g., Palm Beach Isles Assocs. v. United States,* 208 F.3d 1374, 1384 (Fed.Cir.2000) (*Palm Beach Isles* ) ("In light of our understanding of *Lucas* and the other cases we have considered, we hold that the navigational servitude may constitute part of the 'background principles' to which a property owner's rights are subject, and thus may provide the Government with a defense to a takings claim.").

■ The Federal Circuit has explained that "[t]he 'navigational servitude' derives from the Commerce Clause of the Constitution, and gives the United States a 'dominant servitude'—a power to regulate and control the waters of the United States in the interest of commerce." *Id.* at 1382 (footnote omitted). In other words,

> the government's navigational servitude is a dominant servitude which reflects the superior interest of the United States in navigation and the nation's navigable waters.... Thus, upon the determination of Congress to improve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the Eminent Domain Clause of the Fifth Amendment.

*Owen v. United States,* 851 F.2d 1404, 1408 (Fed.Cir.1988) (en banc) (citations omitted); *see also United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 62, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (noting that title to riparian land "is subordinate to the public

right of navigation, and however helpful in protecting the owner against the acts of third parties, it is of no avail against the exercise of the great and absolute power of Congress over the improvement of navigable rivers").

■■■ The navigational servitude shields the government from compensation liability for damage to riparian interests that occur within the bed of a navigable waterway:

The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). While a riparian landowner may possess compensable, state-created property rights in the use of a navigable waterway, the federal navigational servitude is an inherent limitation on such rights. *See United States v. Twin City Power Co.,* 350 U.S. 222, 227, 76 S.Ct. 259, 100 L.Ed. 240 (1956) ("It is no answer to say that these private owners had interests in the water that were recognized by state law. We deal here with the federal domain, an area which Congress can completely preempt, leaving no vested private claims that constitute 'private property' within the meaning of the Fifth Amendment."). In other words, while the taking of exclusive riparian rights by a state or local government may require compensation, no such compensation is required when the federal government takes those same rights in the exercise of its navigational power.

■■■ Although all riparian property located along a navigable waterway is subject to the federal navigational servitude, it is clear that the servitude applies only to those governmental actions and projects that are related to the improvement of navigation. The Federal Circuit has stated that

[t]he precedents clearly establish that the Government's purpose must be related to navigation if it wishes to avoid paying compensation for the regulation or control of private property.

. . .

■■■ And while Congress, in the exercise of this power, may adopt, in its judgment, any means having some positive relation to the control of navigation and not otherwise inconsistent with the Constitution, it may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end.

*Palm Beach Isles,* 208 F.3d at 1384 (quoting *United States v. River Rouge Improvement Co.,* 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339 (1926)) (citations omitted). If a public project is wholly unrelated to navigation, the government is not shielded from compensation liability by the federal navigational servitude.

The determination of whether a particular project will improve navigation, however, is a matter entirely within the broad discretion of the legislative branch. The Supreme Court has noted that

[i]t is not for courts . . . to substitute their judgments for congressional decisions on what is or is not necessary for the improvement or protection of navigation. The role of the judiciary in reviewing the legislative judgment is a narrow one in any case. The decision of Congress that this project will serve the interests of navigation involves engineering and policy considerations for Congress and Congress alone to evaluate. Courts should respect that decision until and unless it is shown "to involve an impossibility. . . ." If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced.

*Twin City Power,* 350 U.S. at 224, 76 S.Ct. 259 (citations omitted); *see also United States v. Chicago, M., St. P. & P.R. Co.,* 312 U.S. 592, 596, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064 (1941) (*Chicago Railroad*) (noting that "the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone"). Thus, the Supreme Court has made it clear that courts should not second-guess the legislature's determination that a particular governmental project will serve the interests of navigation.

The spatial boundaries of the federal navigational servitude are marked by the ordinary high water lines along the banks of a navigable waterway, and the effect of the servitude is not limited to those portions of a river or stream that are actually navigable in fact. *See Allen Gun Club v. United States,* 180 Ct.Cl. 423, 429 (1967) (holding that "[t]he navigation easement is not limited to the thread of the stream where vessels pass, but extends from ordinary high water on one side to ordinary high water on the other"). The ordinary high water line marks both the vertical and the horizontal boundaries of the servitude. *See Owen,* 851 F.2d at 1410 (noting that "Supreme Court precedent properly limits the range of the navigational servitude to the land *beneath and within* the navigable stream's high-water mark") (emphasis added). The navigational servitude does not protect the government against liability for property damages that occur beyond the horizontal and vertical limits established by the ordinary high water line, *see Tri–State Materials Corp. v. United States,* 213 Ct.Cl. 1, 550 F.2d 1, 5–9 (Ct.Cl.1977) (holding that the permanent invasion of an underground mine located below the elevation of the ordinary high water line but beyond the horizontal limits of the riverbed was beyond the reach of the navigational servitude), nor does it apply to riparian property located on a *non-navigable* waterway, *see United States v. Cress,* 243 U.S. 316, 325–26, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (holding that takings claims related to the flooding of property located along a non-navigable stream were not barred by the servitude).[17]

**b. Applicability of the Federal Navigational Servitude to Claims Alleging a Physical Taking of Plaintiffs' Riparian Rights Due to the Environmental Degradation of the St. Lucie River**

**(i) Navigational Purpose of the C & SF Project**

Plaintiffs argue that defendant's discharges into the St. Lucie River are unrelated to

navigation and are therefore beyond the protection of the federal navigational servitude. Plaintiffs first note that the government report incorporated by reference in the Flood Control Act of 1948 expressly states that the navigational benefits of the C & SF Project are "small and incidental" when compared to the project's primary flood control purpose. Pls.' Mot. at 16–17, 38–43. Plaintiffs also assert that the quantity of water released into the river that is attributable to navigational locks is minuscule compared to the massive quantities of water discharged for flood control, irrigation and other purposes.

Plaintiffs point to the comprehensive plan for the C & SF Project in support of their argument that defendant's discharges into the St. Lucie River are not related to navigation. The report states that the project's "navigation benefits are relatively small and incidental when compared with the primary features of flood protection and water control...." H.R. Doc. No. 80–643 at 2. For that reason, the report recommends that the "project should be considered henceforth as one for flood control and other purposes, and that its further consideration should be under the provisions of flood-control law." *Id.* Because the comprehensive plan was adopted and authorized by Congress in the Flood Control Act of 1948 and the Flood Control Act of 1954, plaintiffs argue that it represents the unambiguous position of Congress that the C & SF Project does not serve the purposes of navigation.

Despite plaintiffs' arguments on this point, it is clear that the federal navigational servitude applies if the governmental project bears *any* substantial relation to navigation. *See Palm Beach Isles,* 208 F.3d at 1384. There is no requirement that navigation be the sole—or even the principal—purpose of the challenged public project. *See United States v. Commodore Park,* 324

---

17. The Supreme Court has similarly held that when the government appropriates or damages riparian land located above the ordinary high water line, the quantum of compensation to be paid to the landowner may not include any additional increment of value resulting from the

property's riparian location or attributable to the flow of the adjacent navigable waterway. *See, e.g., United States v. Va. Elec. & Power Co.,* 365 U.S. 624, 629, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961).

U.S. 386, 391–92, 65 S.Ct. 803, 89 L.Ed. 1017 (1945) (" 'The fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional Power.' ") (quoting *State of Arizona v. State of California*, 283 U.S. 423, 456, 51 S.Ct. 522, 75 L.Ed. 1154 (1931)).

Federal acquisition of the existing St. Lucie Canal was authorized by the Rivers and Harbors Act of 1930, Pub.L. No. 71–520, 46 Stat. 918. Although that statute was designed to further a number of public purposes, its principal objective was the improvement of navigation. A governmental report on the Okeechobee Waterway describes the legislative history of the specific provisions of the Rivers and Harbors Act of 1930 authorizing the acquisition of the waterway by the federal government:

> An Act to adopt the Lake Okeechobee project by the Federal Government was introduced in December of 1929, and referred to the Flood Control Committee of the House of Representatives. After several weeks of hearings it became apparent that the long standing policy of the Congress not to become involved in flood control projects was too strong. The Act was referred to the Rivers and Harbors Committee where navigational projects had traditionally been accepted as being of Federal interest. After months of deliberations, the Congress adopted the project as a navigational project with due consideration to be given to flood control.

Okeechobee Waterway Report at 3–15 to 3–16.

Plaintiffs correctly note that the comprehensive report on the C & SF Project states that the navigational benefits of the project would be "relatively small and incidental when compared with the primary features of flood protection and water control." H.R. Doc. No. 80–643 at 2. However, the fact that those navigational benefits are small or incidental is irrelevant for purposes of determining the applicability of the federal navigational servitude. The Flood Control Act of 1948, Pub.L. No. 80–858, 62 Stat. 1175, states that the purposes of the project include "the

benefit of navigation and the control of destructive floodwaters...." In addition, the comprehensive plan referenced by plaintiffs discusses the navigational benefits of the C & SF Project at length. For example, the report notes that "the proposed channels and control works would afford the basic framework for a system of interlocking navigable waterways throughout central and southern Florida, which would connect at several points with the Intracoastal Waterway." H.R. Doc. No. 80–643 at 2. The report further provides that

> [t]he comprehensive plan contemplates enlargement of the St. Lucie Canal and the Caloosahatchee River and navigable channels around Lake Okeechobee, which would incidentally provide the 8–foot waterway authorized by the River and Harbor Act of March 2, 1945. Since the cost of the comprehensive plan includes the 8–foot waterway the annual navigation benefits of this work, amounting to $176,000, are credited to the improvement. The proposed improvements would also result in some expansion of recreational boating throughout this area, and in considerable local use of the improved canals for access and for movement of supplies and equipment. Such incidental navigation uses are believed to be substantial but have not been evaluated.

*Id.* at 49.

The Flood Control Act of 1948 and the comprehensive plan for the C & SF Project both state that the approved project was authorized as an expansion and modification of the projects first authorized in the Rivers and Harbors Act of 1930. *See* Pub.L. No. 80–858, 62 Stat. 1175; H.R. Doc. No. 80–643 at 2. Even if the modification and expansion authorized under the 1948 Act did not further any navigational interests, those modifications could not change the primary navigational purpose of the underlying project. Primary management responsibility for the central features of the original project—Lake Okeechobee and the Okeechobee Waterway—was assumed by the federal government due to the importance of those features to navigation across the state. Those are

precisely the features of the project that are now challenged by plaintiffs in this case.

Significantly, the United States Court of Claims has held that the entire C & SF Project, and the levees surrounding Lake Okeechobee in particular, serve a navigational purpose. In *Coastal Petroleum Co. v. United States*, 207 Ct.Cl. 701, 524 F.2d 1206 (1975), the court rejected the argument that the C & SF Project did not serve any navigational purpose. The plaintiffs in that case, like plaintiffs here, argued that the federal navigational servitude did not preclude their claims against the government for the alleged taking of state leases to mine limestone within Lake Okeechobee because the primary purpose of the levee project was flood control rather than navigation. The court held that the plaintiffs' claims in that case were barred by the federal navigational servitude.

The Court of Claims first noted that the government's invocation of the servitude was supported by the express language of the Flood Control Act of 1948:

> The statute under which many flood control undertakings, including the Central and Southern Florida Flood Control Project, are authorized states that the projects are "for the benefit of navigation and the control of destructive flood waters and other purposes." ... Such a declaration has consistently been held conclusive to determine the navigation purpose of the project.

*Id.* at 1210.

The court next held that in determining whether a governmental action is protected by the navigational servitude, a court must examine the purposes of the *entire project,* rather than the specific actions challenged by a takings claimant:

> The Lake Okeechobee project must be considered as authorized as a whole, for construction as found proper by the Corps of Engineers. When the Corps decided ... to use limestone found below ordinary high water within the navigable waters in order to build the levee, there was "not an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained resulted not from a taking of the

... owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject."

*Coastal Petroleum,* 524 F.2d at 1211–12 (quoting *Chicago Railroad,* 312 U.S. at 597, 61 S.Ct. 772); *see also Commodore Park,* 324 U.S. at 393, 65 S.Ct. 803 (holding that the federal government may, without compensation, "block navigation at one place to foster it at another"); *Allen Gun Club,* 180 Ct.Cl. at 430 (noting that "Congress, and those to whom it has delegated authority, may, without Fifth Amendment liability, employ land submerged under navigable water in the way that in their best judgment helps accomplish the overall purpose even if, intentionally or not, they impair navigation for some purposes in some areas"). In other words, the navigational servitude would have applied even if the levees surrounding Lake Okeechobee served no independent navigational purpose because the project as a whole furthered the interests of navigation.

Although it was not required to go further, the Court of Claims also held that the levees surrounding Lake Okeechobee served an independent navigational purpose:

> Furthermore, the particular action which forms the basis of this suit, the construction of the Lake Okeechobee levee, was included in the project in large part because of the benefits it would provide for navigation on the Intracoastal Waterway, and this was one of the few parts of the project over which the Federal Government retained control after construction. We hold, therefore, that the project involved here is entitled to the benefits of the navigation servitude.

*Coastal Petroleum,* 524 F.2d at 1210 (citation omitted).

The Court of Claims rejected the plaintiffs' distinction between the purposes of flood control and navigation as a false dichotomy, noting that those

> categories are not so distinct. In *Allen Gun Club* ..., we held that flood control projects on the Mississippi and its source streams were also, because of the disastrous effects flooding has on navigation,

projects in aid of navigation and that the navigation servitude therefore applied.

*Id.*

Although Congress may decline to exercise the federal navigational servitude in authorizing a particular public works project, *see United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 739, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) (finding a clear legislative intent to compensate property owners for the loss of riparian rights taken by construction of a reclamation project), the Court of Claims held that Congress had reserved its immunity from compensation liability under the federal navigational servitude in authorizing the C & SF Project:

> Congress may, of course, decide in a particular case not to rely on the servitude, but rather to compensate owners of submerged land in navigable waters for actions which, like those to which the servitude is applicable, are grounded in the power of the Federal Government to regulate commerce. But where a project has a legitimate navigation purpose, and there is no ascertainable Congressional intent to pay compensation, the presumption is that Congress intended to exercise both its navigation power and the navigational servitude. That presumption is strengthened here by the proviso in the statute authorizing the project that "nothing herein shall impair or abridge the powers now existing in the Department of War with respect to navigable streams.... We find nothing to persuade that Congress, despite its traditional right to use the submerged property without compensation, desired to make payment to the owners.

*Coastal Petroleum*, 524 F.2d at 1210 (citations omitted).

Given the express language of the Flood Control Act of 1948, the extensive description of the C & SF Project's navigational benefits in the comprehensive plan, and the holding of the Court of Claims in *Coastal Petroleum*, there is simply no basis for this court to refrain from applying the federal navigational servitude to plaintiffs' claims in the instant case. The primary purpose of defendant's regulatory discharges into the St. Lucie River is to protect the structural integrity of the levees surrounding Lake Okeechobee. The Court of Claims has held that the construction of those levees was a project in aid of navigation. Defendant's releases of water from the lake in this case therefore constitute a project in aid of navigation as well.

Plaintiffs' argument that only a small percentage of the water released into the St. Lucie River is attributable to navigational locks is likewise without merit. First, as previously noted, the relevant inquiry is not whether a particular element of a public project will further navigation, but whether the entire project is related to that purpose. As discussed above, defendant's regulatory releases from Lake Okeechobee—which represent the largest source of discharges into the river—serve an important navigational purpose by protecting the Herbert Hoover Dike. In addition, defendant also releases water from the lake to maintain minimum navigational depths within the St. Lucie Canal. Geller Decl. ¶¶ 20, 22; Ferguson Decl. ¶ 6. However, as discussed *supra*, most significant and dispositive of the issue in the present case, the predecessor of the Federal Circuit has already made a determination that the specific project in dispute here serves a navigational purpose and is therefore subject to the navigational servitude.

### (ii) Applicability of Plaintiffs' Asserted Flooding Exception to the Navigational Servitude

■ Plaintiffs further argue that the federal navigational servitude may not be raised as an affirmative defense when a public project results in the flooding of private property. Pls.' Suppl. Brief at 30–31. It is true that the navigational servitude does not shield the government from liability when its actions result in the permanent inundation of, or damage to, upland property located above or beyond the ordinary high water line. *See, e.g., Owen*, 851 F.2d at 1410; *Tri–State Materials*, 550 F.2d at 5–9. Plaintiffs are incorrect, however, in their assertion that defendant's discharges into the St. Lucie River are likewise beyond the scope of the servitude.

In support of its argument that the servitude does not apply in flooding cases, plaintiffs point to this court's decision in *N.W. La.*

*Fish & Game Pres. Comm'n v. United States,* 79 Fed.Cl. 400 (2007) *(Louisiana Fish & Game II), aff'd,* 574 F.3d 1386 (Fed.Cir. 2009). In that case, a state commission managed a wildlife preserve adjacent to the Red River in Louisiana. The preserve contained a navigable lake that drained through a slough and into the Red River. In order to prevent the growth of unwanted aquatic vegetation in the lake, the commission periodically discharged water from the lake into the river. Following the government's construction of a series of locks and dams on the Red River, the river was raised to a level that prevented the release of water from the lake. The commission asked the federal government to temporarily lower the level of the river to allow the partial drainage of the lake, but the federal government refused the request. The commission then filed a takings claim against the United States in this court, claiming that the government's refusal to lower the level of the river resulted in uncontrolled weed growth within the lake. The government moved to dismiss the commission's suit on the basis that its claims were barred by the federal navigational servitude. This court dismissed the commission's claims related to the alleged weed growth within the lake, but declined to dismiss an additional claim alleging that the federal government's actions resulted in the physical invasion of upland property adjacent to the lake. The commission appealed the dismissal of its claims related to the environmental impacts upon the lake itself, and the Federal Circuit affirmed. *Louisiana Fish & Game III,* 574 F.3d at 1386.

The court's refusal to dismiss the claim related to the alleged invasion of the commission's upland property was based on the well-established principle that the federal navigational servitude does not extend above or beyond the ordinary high water line. Here, all of plaintiffs' claims related to the environmental condition of the St. Lucie River concern riparian rights in the use of the river below the ordinary high water line. Those claims are therefore within the scope of the navigational servitude.

The differential treatment accorded plaintiffs' upland parcels, on the one hand, and

their asserted rights in the use and condition of the St. Lucie River, on the other, highlights a fundamental flaw in plaintiffs' claims alleging a physical taking of the latter. The Supreme Court has explained that the unique *per se* treatment accorded to permanent physical occupations of private property is based on the fact that such invasions deprive the property owner of one of the most essential sticks in its bundle of property rights: the right to exclude. *See Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 539, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) ("The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests."); *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (noting that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation") (footnote omitted). In this case, plaintiffs have never possessed a right to exclude anyone from the use or enjoyment of the St. Lucie River.

The Supreme Court has repeatedly emphasized the distinction between claims involving an actual physical occupation or invasion of land and those involving governmental activities outside of the land that result in incidental damages to the land:

> Since these early cases, this Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation.

*Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 428, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

The Federal Circuit, moreover, has emphasized the narrow scope of the *per se* rule for physical takings set forth in *Loretto:*

The holding of *Loretto* is quite narrow. It applies only to permanent physical occupations either by the government or by a third party acting under government authority.

. . .

A physical occupation, as defined by the Court, is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property.

*Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1353 (Fed.Cir.2002).

In each of the flooding cases cited by the parties in which a court has awarded or upheld compensation for a physical taking of private property, the government had engaged in activity that resulted in the permanent flooding, destruction or invasion of fast land located above or beyond the ordinary high water line or along a non-navigable body of water. *See, e.g., United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 805–11, 70 S.Ct. 885, 94 L.Ed. 1277 (1950) (holding that the subsurface invasion of fast land beyond the bed of a navigable river was beyond the scope of the servitude); *Dickinson,* 331 U.S. at 747–50, 67 S.Ct. 1382 (holding that flooding and erosion of land located above the ordinary high water line was not barred by the federal navigational servitude); *Cress,* 243 U.S. at 319–28, 37 S.Ct. 380 (holding that the construction of a dam that resulted in the flooding of riparian land located on a non-navigable stream was beyond the scope of the servitude); *Owen,* 851 F.2d at 1408–16 (holding that public improvements to a navigable river that caused a house located on upland property to collapse into the river were not protected by the navigational servitude); *Cooper v. United States,* 827 F.2d 762, 763–64 (Fed.Cir.1987) (holding that the inundation of upland property that resulted in the destruction of trees was beyond the scope of the navigational servitude); *Tri–State Materials,* 550 F.2d at 4–9 (holding that the construction of a lock and dam system that flooded an underground mine located on non-riparian land was beyond the scope of the servitude); *Barnes v. United States,* 210 Ct. Cl. 467, 538 F.2d 865, 870–73 (1976) (holding

that the government's construction of a pair of dams that resulted in the subsurface flooding of riparian and non-riparian land beyond the ordinary high water line of a navigable river was not protected by the navigational servitude); *Kingsport Horizontal Prop. Regime v. United States,* 46 Fed.Cl. 691, 693–96 (2000) (holding that erosion damage to upland property located beyond the scope of an easement acquired for the construction of a canal was not barred by the navigational servitude).

In contrast, courts have uniformly rejected claims alleging the taking of riparian property adjacent to a navigable waterway when the government did not physically invade that property. *See, e.g., Willow River Power,* 324 U.S. at 502–11, 65 S.Ct. 761 (holding that the servitude barred a claim by a power company alleging that the government had raised the level of a navigable river and interfered with the operation of its mill); *Commodore Park,* 324 U.S. at 390–93, 65 S.Ct. 803 (holding that the government's deposit of fill material into a navigable stream, which eliminated the plaintiff's access to an adjacent bay from his property, was protected by the navigational servitude); *Chicago Railroad,* 312 U.S. at 596–97, 61 S.Ct. 772 (reversing a trial court's award of compensation for damage to an embankment located below the ordinary high water line of a navigable river); *Scranton v. Wheeler,* 179 U.S. 141, 162–64, 21 S.Ct. 48, 45 L.Ed. 126 (1900) (holding that a takings claim related to the government's construction of a pier in a navigable waterway, which completely eliminated a riparian owner's access to the water from his land, was barred by the federal navigational servitude); *Gibson v. United States,* 166 U.S. 269, 271–76, 17 S.Ct. 578, 41 L.Ed. 996 (1897) (holding that a takings claim related to the government's construction of a dike below the ordinary high water line, which eliminated a riparian owner's access to the water from her land, was barred by the federal navigational servitude); *Allen Gun Club,* 180 Ct.Cl. at 428–31 (holding that government-induced shoaling in a non-navigable portion of a navigable river was within the scope of the servitude); *City of Demopolis v. United States,* 167 Ct.Cl. 94, 334 F.2d 657, 658–60 (1964) (holding that the federal navi-

gational servitude barred a municipality's takings claim alleging that the government's creation of a reservoir on a navigable river interfered with the operation of its sewage disposal system).

■ In the absence of a permanent occupation or an intermittent but inevitably recurring invasion of land, there can be no physical taking of that property. *See Yee v. City of Escondido*, 503 U.S. 519, 527, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land."). In contrast to many of the cases cited by plaintiffs, *see, e.g., Coates v. United States*, 117 Ct.Cl. 795, 93 F.Supp. 637 (1950) (holding that the government effected a physical taking when improvements to a navigable river resulted in the deposit of hundreds of thousands of tons of sand on a riparian landowner's upland property); *Bassett, New Mexico LLC v. United States*, 55 Fed.Cl. 63 (2002) (holding that the government effected a physical taking of property when it deposited large quantities of hazardous waste in a quarry located on the plaintiff's land); *Martin v. City of Monticello*, 632 So.2d 236 (Fla. 1st Dist.Ct.App.1994) (holding that a municipality effected a physical taking of private property when it discharged treated sewage effluent directly into a non-navigable wetland located on the plaintiff's land), plaintiffs' claims alleging a physical taking of plaintiffs' riparian rights due to the environmental degradation of the St. Lucie River do not involve a physical invasion or permanent occupation of their upland property.

Plaintiffs' extremely expansive definition of the word "flooding" essentially deprives that term of all meaning. *See* Gray Decl. ¶ 22 (claiming that defendant's discharges through the S–80 control structure have "flooded" the St. Lucie River). In the context of takings cases involving the inundation of private property, the term "flooding" has invariably been used to refer to an actual physical invasion of land located above the ordinary high water line or mean high tide line. *See, e.g., Pumpelly v. Green Bay & Miss. Canal Co.*, 13 Wall. 166, 80 U.S. 166, 181, 20 L.Ed. 557 (1871) (holding that the construction of a government-authorized mill may effect a taking when other land "is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it"). Here, there have been no allegations that plaintiffs' riparian rights have been harmed by a physical invasion of water upon their properties. As noted above, plaintiffs do not own the St. Lucie River, so the discharge of water into that river in no way "floods" their property.

In accordance with the foregoing, the court holds that all of plaintiffs' claims alleging a taking of their asserted riparian rights due to the environmental degradation of the St. Lucie River are barred by the federal navigational servitude. Although the court also finds that plaintiffs, beyond their special riparian rights unaffected by the Corps' actions, do not possess any compensable property rights in the use or condition of the St. Lucie River, a contrary finding would not change the result in this case because any state-created property rights are preempted by the servitude. The court therefore holds that defendant is entitled to summary judgment with respect to those claims alleging a taking of plaintiffs' asserted riparian rights.

### III. Claims Alleging a Physical Invasion of Plaintiffs' Upland Parcels

In addition to their claims that defendant's discharges of polluted non-saline water into the St. Lucie River effected a physical taking of their asserted riparian rights in the use and condition of the river, certain plaintiffs further claim that those discharges resulted in a permanent physical invasion of their upland parcels. This second category includes the claims related to the alleged flooding of the Guys' garage, the alleged contamination of the Barattas' well, the alleged destruction of Ann MacMillan's mangrove trees, and the alleged invasion of certain of plaintiffs' properties by noxious odors. The court will refer to these claims as plaintiffs' upland parcel claims.

#### A. Jurisdictional Concerns

#### 1. Defendant's Tort Claims Argument

Defendant asserts that this court lacks subject matter jurisdiction over plaintiffs' up-

land parcel claims because those claims sound in tort. The Tucker Act provides in relevant part that the

United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages *in cases not sounding in tort.*

28 U.S.C. § 1491(a)(1) (2006) (emphasis added). Specifically, defendant has argued that plaintiffs' upland parcel claims do not constitute a taking of property requiring compensation. Defendant has therefore moved to dismiss those claims under RCFC 12(b)(1).

The Federal Circuit has held that torts and takings may spring from the same operative facts. *Moden v. United States,* 404 F.3d 1335, 1339 n. 1 (Fed.Cir.2005) (noting that "the same operative facts may give rise to both a taking and a tort") (citations omitted). Thus, in the takings context, this court does not dismiss claims under RCFC 12(b)(1) simply because the facts alleged might support a tort claim. *See id.* ("Whether the government's actions separately give rise to a tort action is irrelevant...."). For this reason, defendant's argument that plaintiffs' upland parcel claims sound in tort does not lend anything to this court's jurisdictional analysis. Plaintiffs allege in their upland parcel claims that their property interests were taken by the actions of the government. If timely, these claims are within the jurisdiction of this court. *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.,* 525 F.3d 1299, 1309 (Fed.Cir.2008) ("In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a non-frivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source.").

### 2. Timeliness of Claims Alleging a Physical Invasion of Plaintiffs' Upland Parcels

Defendant did not raise a statute of limitations defense to plaintiffs' upland parcel claims. The court raises this issue *sua sponte,* as it must. *See Arctic Corner,* 845 F.2d at 1000 ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt."). The court recites here the factual allegations relevant to the timeliness of plaintiffs' upland parcel claims.

Certain plaintiffs claim that their properties were invaded by noxious odors whenever defendant discharged polluted water into the St. Lucie River. *See* Crispin Decl. ¶ 2; Jordan Decl. ¶ 2; Mildenberger Decl. ¶ 3; Robert Paré Decl. ¶ 2; Patteson Decl. ¶ 2; Rutzke Decl. ¶ 2; Tafoya Decl. ¶ 2; Wakeman Decl. ¶ 2. Plaintiffs have not asserted that those odors only began to invade their upland parcels within six years of the filing of this suit. Given the long history of pollution in the river, it appears unlikely that the odors occurred only after November 13, 2000. On the other hand, plaintiffs assert that the degree of pollution in the discharged water has increased significantly in recent years. The record currently before the court is inconclusive as to the accrual of this claim.

Ann MacMillan merely notes that "[w]hile mangrove trees originally thrived on my waterfront, now I have to keep replacing them because they will not grow or stick, especially near the water." MacMillan Decl. ¶ 2. Unfortunately, Ms. MacMillan does not indicate when mangrove trees thrived on her waterfront or when they first began to die. Ms. MacMillan acquired her upland parcel in 1987. Pls.' Suppl. Brief at 25. Plaintiffs have not indicated when the alleged destruction of Ms. MacMillan's trees first occurred or when the permanence of the situation (*i.e.,* the inability to grow mangrove trees on the property) became apparent. The accrual of this claim therefore cannot be determined from the record before the court.

Plaintiff Robert Baratta asserts that he and his wife stopped using the well on their property because its water had become contaminated. Baratta Decl. ¶ 2. According to Mr. Baratta, the "well water leaves an orange-brown stain on anything it touches, including plants, trees, and the side of my house." *Id.* Plaintiffs have presented no allegations, however, which demonstrate when

the Barattas' well was first contaminated by polluted water from the river, nor have they expressed any basis for believing the contamination is a permanent condition. The Barattas acquired their upland parcel in 2000. Pls.' Suppl. Brief at 25. Robert Baratta's declaration implies that he and his wife used their well to water their trees and plants for some period of time before the water became contaminated, so it is a reasonable inference that the subsequent contamination of the well likely occurred sometime after November 13, 2000. The Barattas' upland parcel claim may be timely, but the record is not conclusive on this issue.

William Guy states that his "property has also been damaged when the river floods during the Corps' discharges, specifically damaging our garage and destroying everything on the floor of our garage." Guy Decl. ¶ 2. Once again, however, plaintiffs have failed to discuss when the alleged invasion of the parcel occurred. Because William and Stella Guy acquired their upland parcel in 2002, Pls.' Suppl. Brief at 25, one could infer that the permanence of the flooding did not become apparent until after that date. If that inference is correct, then the takings claim related to the alleged flooding of the Guys' garage was timely filed. Based on the record currently before the court, however, the reasonableness of that inference is uncertain. Because the magnitude of defendant's discharges between 2003 and 2005 pales in comparison to its discharges in many prior years, it is likely that any flooding experienced by the Guys was preceded by multiple occurrences of inundation in earlier years. Without further development of the record, the court is unable to make a determination on this issue.

The court is unable to determine whether the claims alleging a permanent physical invasion of plaintiffs' upland parcels first accrued before or after November 13, 2000. The court notes that plaintiffs' upland parcel claims have received little discussion in the parties' briefing and, as noted above, key information is missing. The court therefore defers ruling on the timeliness of these claims, but reminds plaintiffs that going forward they bear the burden of establishing the court's jurisdiction over their upland parcel claims and the timeliness of those claims. *See Alder Terrace,* 161 F.3d at 1377 ("As the plaintiff in the underlying suit, the burden of establishing jurisdiction, including jurisdictional timeliness, must be carried by the ... [plaintiff].") (citing *McNutt,* 298 U.S. at 189, 56 S.Ct. 780).

**B. Cross Motions for Summary Judgment—*Ridge Line* Test**

██ The parties' briefing has focused almost exclusively on those claims related to the alleged taking of plaintiffs' riparian rights due to the environmental degradation of the St. Lucie River. Because the parties have not adequately addressed plaintiffs' remaining claims alleging a physical invasion of several of plaintiffs' upland parcels, the court is unable to grant summary judgment with respect to those claims.[18] This court has previously recognized that an incomplete factual record may make it impossible to overcome the reasonable inference accorded to each non-moving party's facts, and may prevent the court from granting summary judgment to either party. *Lockheed Martin Corp. v. United States,* 49 Fed.Cl. 241, 245–46 (2001) ("[When] the facts developed do not allow the court to determine the central question [before it], it denies both motions for summary judgment ....") (citations omitted). In addition, even when the court is convinced that one of the parties may be

---

18. Defendant has not disputed that plaintiffs possess protected property rights in the fee simple ownership of their upland parcels. The court presumes for the purposes of its analysis that those rights are not limited by the federal navigational servitude. As discussed in Section II.B.2 *supra,* the federal navigational servitude does not extend beyond the horizontal and vertical boundaries of the riverbed established by the ordinary high water line. *See Owen,* 851 F.2d at 1410 (holding that "Supreme Court precedent properly limits the range of the navigational servitude to the land beneath and within the navigable stream's high-water mark"). None of the alleged injuries to plaintiffs' upland parcels are certain to have occurred below the ordinary high water line. The court therefore presumes that all of the plaintiffs alleging a permanent physical invasion of their upland parcels possess a compensable property right that is unencumbered by the federal navigational servitude.

entitled to judgment as a matter of law, the court possesses the discretion to deny a motion for summary judgment on a factual record that does not allow a reasoned consideration of the claims and defenses asserted by the parties. *See Ehlers–Noll, GmbH v. United States,* 34 Fed.Cl. 494, 499 (1995) (" 'The court has no discretion to grant a motion for summary judgment, but even if the court is convinced that the moving party is entitled to such a judgment the exercise of sound judicial discretion may dictate that the motion should be denied, and the case fully developed.' ") (quoting *McLain v. Meier,* 612 F.2d 349, 356 (8th Cir.1979)).

Although plaintiffs' non-frivolous allegation of an uncompensated taking is sufficient to overcome defendant's motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must nonetheless undertake a separate analysis to determine whether plaintiffs' claims are most appropriately treated under takings law or as torts.[19] *See Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1355 (Fed.Cir.2003) (holding that a takings claimant "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances").

■■■ The Federal Circuit has adopted a two-pronged test to discover whether a physical taking has occurred. First, plaintiffs must demonstrate that defendant intended to invade a protected property interest or that the alleged invasion of plaintiffs' property was the direct, natural, or probable result of defendant's intentional actions. *Ridge Line,* 346 F.3d at 1355. Second, plaintiffs must demonstrate that defendant appropriated a benefit for itself at plaintiffs' expense or preempted plaintiffs' right to enjoy their property for an extended period of time. *Id.* at 1356. In order to satisfy the second prong of the test, plaintiffs must prove that defendant's interference with plaintiffs' property rights "was substantial and frequent enough to rise to the level of a taking." *Id.* at 1357; *see also Moden,* 404 F.3d at 1342 (holding

that a takings claimant "must show that the invasion appropriated a benefit to the government at the expense of the property owner, or at least by preempting the property owner's right to enjoy its property for an extended period of time, rather than merely by inflicting an injury that reduces the property's value"). Plaintiffs must satisfy both prongs of the *Ridge Line* test to demonstrate that their claims are properly analyzed under takings law.

### 1. Foreseeability of the Alleged Invasion of Plaintiffs' Upland Parcels

■■■ Plaintiffs do not claim that defendant intended to take their upland parcels. Plaintiffs must therefore demonstrate that the alleged invasion of their rights was the direct, natural, or probable result of defendant's discharges. *Ridge Line,* 346 F.3d at 1355. Both foreseeability and causation are required elements of any physical takings claim. *See Cary v. United States,* 552 F.3d 1373, 1379–80 (Fed.Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 2878, 174 L.Ed.2d 580 (2009) ("Foreseeability and causation are separate elements that must both be shown (when intent is not alleged).") (citing *Moden,* 404 F.3d at 1343). In determining whether plaintiffs have met the first prong of the *Ridge Line* test, the court will first ascertain whether the injuries allegedly suffered by plaintiffs were a reasonably foreseeable consequence of the government's actions at the time those actions occurred. *Moden,* 404 F.3d at 1343 ("However, proof of causation, while necessary, is not sufficient for liability in an inverse condemnation case. In addition to causation, an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury.") (citation omitted). In short, plaintiffs must demonstrate that the government knew, or should have known, that its discharges would result in the alleged invasion of plaintiffs' upland parcels at the time those discharges were made.

**19.** Because the court has already held that plaintiffs' claims related to the alleged taking of their riparian rights are both untimely and preempted by the federal navigational servitude, the court's

analysis of plaintiffs' suit under *Ridge Line* will be limited to those claims alleging damage to their upland parcels above and beyond the ordinary high water line.

■ Based on the evidence presented by the parties, it is not clear whether defendant could have reasonably foreseen the alleged damage to plaintiffs' upland parcels. Plaintiffs have not presented any evidence indicating that defendant should have anticipated the contamination of the Barattas' well, the flooding of the Guys' garage, the destruction of Ann MacMillan's mangrove trees, or the invasion of certain of plaintiffs' parcels by noxious odors. On the other hand, defendant has not presented any evidence suggesting that those alleged harms were not reasonably foreseeable. The court therefore concludes that there is a genuine issue of material fact concerning the foreseeability of the alleged damage to plaintiffs' upland parcels. For that reason, summary judgment is not appropriate with respect to this issue.

### 2. Causation[20]

■ Defendant has argued that its discharges were not the cause of the injuries alleged by plaintiffs. The relevant question in determining causation is whether the challenged governmental action was the direct and proximate cause of the plaintiff's alleged injuries. *See, e.g., Cary*, 552 F.3d at 1379–80 (holding that in addition to finding that an alleged injury was a reasonably foreseeable result of the government's action, "the court must determine that no break in the chain of causation existed between the suspected government authorized action and the injury"). If the alleged damage would have occurred even in the absence of the challenged governmental action, then the causation requirement has not been met.

Defendant has raised two distinct causation arguments. First, defendant argues that it was not the original source of the nutrients and sediment present in the water that was discharged into the St. Lucie River.

According to defendant, pollutants from a number of different agricultural and urban sources were intervening causes that broke the chain of causation between defendant's discharges into the river and the injuries alleged by plaintiffs. Defendant further argues that unusually high rainfall between 2003 and 2005 was another intervening event that broke the chain of causation in this case. According to defendant, the discharges into the St. Lucie River were necessary due to high lake levels, which were caused by high rainfall during that period. Defendant's second causation argument is based on the assertion that plaintiffs' damages would have occurred even in the absence of defendant's discharges because the St. Lucie River receives inflows of polluted fresh water from a number of sources other than Lake Okeechobee. The court addresses both of defendant's causation arguments below.

■ Defendant's first causation argument is inconsistent with both case law and the commonly understood meaning of the term "intervening cause." [21] Defendant does not dispute that significant quantities of nutrients and sediment were present in the discharged water before it was released into the St. Lucie River. It is simply inaccurate to characterize the nutrients and sediment as intervening causes of plaintiffs' alleged injuries because those pollutants entered the water management system *prior to* defendant's discharges. In contrast, in each of the cases cited by defendant, the intervening event that broke the chain of causation occurred *subsequent to* the challenged governmental action. In *Cary*, for example, the plaintiffs asserted that the government's land management policies had resulted in a forest fire that damaged the plaintiffs' properties. 552 F.3d at 1375. The court held that the government had not caused the plaintiffs' alleged injuries because the fire was started by a lost

---

**20.** The Federal Circuit has traditionally treated the causation requirement as a necessary element of any takings claim, which is separate and distinct from the tort versus takings inquiry embodied in the *Ridge Line* test. In some recent cases, however, the court has addressed the foreseeability prong of the *Ridge Line* test in tandem with the required but-for causation analysis. *See, e.g., Cary*, 552 F.3d at 1378–81; *Moden*, 404 F.3d at 1342–46. Because of the logical affinity between the requirements of foreseeability and

causation, the court will address both within the overall framework established in *Ridge Line*.

**21.** An intervening cause is typically defined as an "event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." Black's Law Dictionary 250 (9th ed.2009).

hunter. *Id.* at 1376–80. Because the fire would not have occurred in the absence of the subsequent action of the hunter, the government could not be held liable for the alleged taking of the plaintiffs' properties. Here, the pollution *first* entered the water management system, and *then* defendant discharged the polluted water into the St. Lucie River. The nutrients and sediment in the discharged water were not an intervening cause that broke the chain of causation between defendant's actions and plaintiffs' alleged injuries.

■ Defendant states that high rainfall was the cause of its discharges into the St. Lucie River. In addition, however, defendant makes the contradictory assertion that high rainfall was an intervening cause between its discharges and the alleged damage to plaintiffs' upland parcels. The evidence supports defendant's claim that its releases of water into the river were made to protect the structural integrity of the Herbert Hoover Dike in response to both actual and anticipated precipitation.[22] Once again, however, defendant's characterization of rainfall as an "intervening cause" between the discharges and plaintiffs' alleged injuries is inconsistent with both precedent and the common definition of that term. The water *first* enters the lake as rainfall or runoff, and is *subsequently* discharged into the St. Lucie Canal and the St. Lucie River. Although high rainfall is certainly a *contributing* cause of plaintiffs' alleged injuries, it is not an *intervening* cause between defendant's actions and those injuries.

■ Defendant's second causation argument is more plausible than its first. According to defendant, the St. Lucie River receives substantial additions of nutrients and sediment from sources other than Lake Okeechobee. Because plaintiffs have failed to prove that their alleged injuries would not have occurred in the absence of defendant's discharges, defendant argues that they have failed to meet their burden on the issue of causation. Unless defendant can demonstrate that all of the asserted damage to plaintiffs' upland parcels would have occurred even in the absence of defendant's discharges, however, the evidence that there are other contributing sources of pollution into the river will be relevant only to the calculation of damages. In other words, defendant must prove that all of the alleged damage to plaintiffs' upland parcels would have occurred even if defendant had made no discharges into the St. Lucie River between 2003 and 2005. The determination of causation in flooding cases is particularly difficult. *See, e.g., Hendricks v. United States,* 14 Cl. Ct. 143, 149 (1987) (observing that "[c]ausation of flooding is a complex issue which must be addressed by experts"). The court is unable to determine the extent of plaintiffs' damage attributable to defendant's discharges into the river because causation, on this record, poses genuine issues of material fact.[23]

---

**22.** Defendant claims that, given the effect of sustained high lake levels on the structural integrity of the Herbert Hoover Dike, it had no reasonable alternative to making high-volume releases of water into the St. Lucie River. Although the absence of practical alternatives does not transform high rainfall into an intervening cause of plaintiffs' injuries, it might have provided an additional defense to plaintiffs' claims under the doctrine of actual necessity. Under that doctrine, the government may be relieved of compensation liability under the Takings Clause when the government damages or destroys private property in order to avoid even greater damage to other property. *See, e.g., United States v. Caltex,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952) (holding that the government's intentional destruction of private oil terminal facilities in the Philippines during World War II to prevent their seizure by advancing Japanese forces was not a compensable taking of private property); *Bow-*

*ditch v. City of Boston,* 101 U.S. 16, 25 L.Ed. 980 (1879) (holding that the destruction of buildings by a municipal fire department to prevent the spread of a fire was not a compensable taking). As previously stated, the lion's share of discussion and briefing was directed to riparian rights as opposed to upland parcels. Thus, inadequate factual and legal development prevents the court from addressing this issue further.

**23.** Defendant has also introduced evidence that appears to demonstrate that its discharges into the St. Lucie River have no significant influence on water levels within the river. *See* Zediak Decl. ¶ 10. Although such evidence appears to undermine plaintiffs' argument that defendant's discharges have physically invaded plaintiffs' upland parcels above the ordinary high water line, plaintiffs have failed to respond to it.

## 3. Permanence of the Governmental Invasion

In addition to proving that the alleged invasion of plaintiffs' upland parcels and the alleged damage to those parcels were reasonably foreseeable consequences of the government's actions, plaintiffs must also demonstrate that defendant's discharges represented a permanent invasion of private property, rather than an isolated event. *See Ridge Line*, 346 F.3d at 1357 ("The second prong of the taking-tort inquiry . . . requires the court to consider whether the government's interference with any property rights . . . was substantial and frequent enough to rise to the level of a taking."); *Wilfong v. United States*, 202 Ct.Cl. 616, 480 F.2d 1326, 1329 (1973) (holding that in order "to support a Fifth Amendment taking via inverse condemnation there must be not only a Federal activity or project which is permanent in nature, but that such activity or project must impose on private property certain consequences which are themselves permanent, and that their recurrence is inevitable even if only intermittent").

■ The court is unable to discern whether the alleged injuries to plaintiffs' upland parcels are physical invasions of sufficiently permanent duration and intensity to satisfy the second prong of the *Ridge Line* test. This court has previously held that the government's contamination of groundwater located below private land can provide the basis for a takings claim in appropriate circumstances. *See, e.g., Hansen v. United States*, 65 Fed.Cl. 76, 122–24 (2005). Here, however, plaintiffs have failed to provide sufficient evidence to support their claim that the alleged contamination of the Barattas' well has effected a compensable taking of their property. Robert Baratta's declaration states that he and his wife "no longer use the water from my well since it is contaminated by the River" and further observes that the water drawn from the well "leaves an orange-brown stain on anything it touches, including plants, trees, and the side of our house." Baratta Decl. ¶ 2. Without more evidence regarding the exact nature of the alleged contamination and the effect of that contamination on the reasonable use of the property, however, the court cannot determine whether the alleged infiltration of the Barattas' well by polluted river water rises to the level of a taking. In *Hansen*, for example, the groundwater below the plaintiff's ranch had been contaminated by a deadly pesticide that had migrated from leaking containers buried on adjacent government property. *Hansen*, 65 Fed.Cl. at 88–93. Because the continued operation of the ranch required a clean supply of groundwater, the alleged contamination had a severe impact on the use of the property. In this case, the evidence before the court does not indicate the nature or degree of the harm to the Barattas' well water, whether the alleged contamination is permanent, or whether that contamination will have any substantial impact on the continued use of the property.

■ Plaintiffs have likewise failed to present sufficient evidence to support their claim that the alleged flooding of the Guys' garage should be treated as a physical taking of property instead of a tort. The permanent inundation of land is one clear example of a physical invasion that rises to the level of a compensable taking, *see Pumpelly*, 80 U.S. (13 Wall.) at 181, and the Supreme Court has held that an intermittent invasion of land may be sufficient in some cases, *see, e.g., Cress*, 243 U.S. at 328, 37 S.Ct. 380 (holding that the repeated, though temporary, inundation of land located along a non-navigable stream was a physical taking requiring compensation). On the other hand, a single incident of inundation clearly does not rise to the level of a compensable taking. *See, e.g., B Amusement Co. v. United States*, 148 Ct.Cl. 337, 180 F.Supp. 386, 389 (1960) (holding that a single flooding does not constitute a taking if the plaintiff cannot demonstrate that such flooding will inevitably recur); *North Counties Hydro–Electric Co. v. United States*, 108 Ct.Cl. 470, 70 F.Supp. 900, 903 (1947) ("It is clear under the authorities that the flooding of an owner's land on but one occasion does not constitute a taking. Before there can be a taking a servitude must have been imposed upon the land, that is to say, a subjection of the land for a more or less definite time to a use inconsistent with the rights of the owner."). William Guy's declaration merely

states that his "property has also been damaged when the river floods during the Corps' discharges, specifically damaging our garage and destroying everything on the floor of our garage." Guy Decl. ¶ 2. The declaration does not indicate whether the Guys' garage has been flooded more than once, nor does it assert whether such flooding will inevitably recur.

With respect to the alleged destruction of Ann MacMillan's mangrove trees, Ms. MacMillan asserts that "[w]hile mangroves originally thrived on my waterfront, now I have to keep replacing them because they will not grow or stick, especially near the water." MacMillan Decl. ¶ 2. There is no explanation in the declaration as to whether defendant's discharges are related to the death of Ms. MacMillan's mangrove trees or to her inability to grow new trees on her property. The Federal Circuit has previously held that live trees located on private land are compensable property interests for purposes of the Fifth Amendment and may not be taken or destroyed by the government without the payment of compensation. *See, e.g., Cooper,* 827 F.2d at 763–64 (holding that the destruction of timber caused by government-induced flooding was a compensable taking of private property). In this case, however, there is no evidence of any relationship between defendant's actions and the death of the mangrove trees on Ms. MacMillan's property.

Finally, defendant argues that plaintiffs' claims alleging a physical invasion of certain of their upland properties by noxious odors amount to no more than a potentially tortious injury that should not be viewed through the lens of takings law. Plaintiffs respond that the invasion of private property by noxious odors can rise to the level of a compensable taking. In support of that proposition, plaintiffs point to the Supreme Court's decision in *Richards v. Wash. Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914). In *Richards,* a railroad company constructed a ventilation shaft that directed all of the smoke and exhaust in a railway tunnel directly onto an adjacent parcel of land. The plaintiff in that case filed a private nuisance suit against the railroad company, and the company responded that the ventilation shaft

was not a nuisance because its construction was authorized by the government. The Court held that government authorization cannot immunize private parties from nuisance liability if the challenged activities would have amounted to a compensable taking if carried out by the government itself. In that case, the Court concluded that government construction of the ventilation shaft, and the resulting injury to the plaintiff's property, would have constituted a taking requiring the payment of just compensation under the Fifth Amendment.

*Richards* appears to undermine defendant's categorical assertion that the physical invasion of private property by noxious odors or fumes could *never* give rise to a compensable taking. On the other hand, plaintiffs have failed to cite a single case in which a federal court has awarded or upheld compensation for a taking due to the invasion of private property by unpleasant odors. In further support of their argument, plaintiffs cite the Federal Circuit's decision in *Argent v. United States,* 124 F.3d 1277 (Fed.Cir. 1997). In that case, the Federal Circuit held that frequent low-altitude flights in close proximity to the plaintiff's land could effect a taking of that property when the noise and vibrations caused by the aircraft significantly impaired the owner's use and enjoyment of his land. *Id.* at 1281–85. Here, however, plaintiffs have not demonstrated that the alleged invasion of their upland parcels by noxious odors has significantly impaired their use or enjoyment of those properties. In *Richards,* the Supreme Court emphasized that incidental noises, vibrations and odors normally associated with the non-negligent operation of a railroad will not support a private nuisance claim. *Richards,* 233 U.S. at 553–54, 34 S.Ct. 654. Similarly, the Federal Circuit noted in *Argent* that the normal noises and vibrations associated with the operation of government aircraft do not give rise to a compensable taking. *Argent,* 124 F.3d at 1284. Without further development of the evidentiary record, the court cannot determine whether the alleged invasion of plaintiffs' upland parcels by odors is properly characterized as a taking or a tort.

Because the evidence presented by the parties on the issues of foreseeability, causation and permanence presents several genuine issues of material fact, the court must deny the parties' cross motions for summary judgment with respect to plaintiffs' upland parcel claims.

## CONCLUSION

The St. Lucie River is, by all accounts, a national treasure. The long-term environmental consequences of defendant's massive discharges into the river are tragic, and the court takes note of plaintiffs' tireless efforts to reverse that damage. The court is not free, however, to ignore applicable statutes of limitation, to invent new property rights out of whole cloth or to create novel standards of takings liability in order to reach a laudable outcome. As the United States Court of Claims observed in an earlier case, "[m]uch as we may regret the destruction of unspoiled natural game and fishing areas in navigable waters, the remedy lies in the hands of Congress, not the courts." *Allen Gun Club,* 180 Ct.Cl. at 431.

In conclusion, the court holds as follows:

First, plaintiffs' claims alleging a physical taking of their riparian rights due to the environmental degradation of the St. Lucie River accrued more than six years before the instant suit was filed and are therefore untimely. For that reason, defendant's motion to dismiss those claims pursuant to RCFC 12(b)(1) is hereby granted.

Second, although the court dismisses as untimely plaintiffs' claims alleging a taking of their riparian rights, it further notes that those claims would likewise fail on the merits as well. Plaintiffs have failed to demonstrate the existence of any compensable property rights under Florida law in the use or environmental condition of the St. Lucie River, and any such rights would be barred in any event by the federal navigational servitude.

Third, the court denies defendant's motion to dismiss those claims related to plaintiffs' upland parcels pursuant to RCFC 12(b)(1) on the basis that they sound in tort. Plaintiffs have made a non-frivolous assertion that they are within the class of plaintiffs protected by a money-mandating provision of the United States Constitution. Specifically, plaintiffs have alleged that defendant has taken their property without the payment of just compensation in violation of the Takings Clause of the Fifth Amendment. That assertion is sufficient to survive defendant's motion to dismiss.

Fourth, the court is unable to determine whether plaintiffs' claims alleging a physical invasion of certain of their upland parcels were filed within the six-year statute of limitations applicable to takings claims in this court. Thus, the court defers ruling on the timeliness of those claims.

Fifth, the evidence presented by the parties is insufficient to permit a determination by the court of whether plaintiffs' upland parcel claims survive the *Ridge Line* test for physical takings. The court must therefore deny the parties' cross motions for summary judgment on that issue.

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant's motion to dismiss plaintiffs' suit under RCFC 12(b)(1), filed January 16, 2009, is **GRANTED in part,** as to plaintiffs' claims alleging a physical taking of their riparian rights, and **DENIED in part,** as to plaintiffs' claims alleging a physical invasion of certain of their upland parcels;

(2) Defendant's motion for summary judgment under RCFC 56, filed January 16, 2009, is **GRANTED in part,** as to plaintiffs' claims alleging a physical taking of their riparian rights, and **DENIED in part,** as to plaintiffs' claims alleging a physical invasion of certain of their upland parcels;

(3) Plaintiffs' cross motion for summary judgment under RCFC 56, filed March 16, 2009, is **DENIED** as to defendant's liability on plaintiffs' claims alleging a physical taking of their riparian rights and plaintiffs' claims alleging a physical invasion of certain of their upland parcels;

(4) Pursuant to RCFC 54(b), insofar as there is no just reason for delay,[24] the Clerk's Office is directed to **ENTER** judgment for defendant as to plaintiffs' claims alleging a physical taking of their riparian rights, and to **DISMISS** these claims;

(5) The parties are directed to **CONFER** to determine how they wish to proceed with respect to plaintiffs' upland parcel claims and whether these matters may be settled by the parties;

(6) The parties shall **FILE** a **Joint Status Report** by **February 26, 2010** proposing the next steps in this litigation; and

(7) No costs.

---

**24.** The court believes that a final and expeditious resolution of plaintiffs' claims alleging a physical taking of their riparian rights in the St. Lucie River would promote judicial economy and conserve the parties' resources. Plaintiffs' riparian-rights claims appear to involve an issue of first impression in this court, and, if challenged, a final resolution of that issue by the Federal Circuit would provide valuable guidance not only to the parties in the present case, but to similarly situated plaintiffs in future takings cases. In addition, the two separate categories of takings claims involved in this case—*i.e.*, plaintiffs' riparian-rights claims and their upland-parcel claims—present distinct issues of both fact and law. Any further proceedings related to plaintiffs' upland-parcel claims are unlikely to have any relevance to their riparian-rights claims.